# GULF & S. I. R. Co. *v.* SIMMONS *et al.*[*]

(Division A.   May 28, 1928.)

[117 So. 345.   No. 26846.]

508

*Corpus Juris-Cyc. References: Death, 17CJ, p. 1316, n. 84; Railroads, 33Cyc, p. 927, n. 72; p. 1045, n. 35; p. 1105, n. 36; p. 1129, n. 74; p. 1137, n. 24; Trial, 38Cyc, p. 1779, n. 75; On duty of railroad to construct and maintain safe crossings, see 22 R. C. L. 992; 4 R. C. L. Supp. 1482; 6 R. C. L. Supp. 1345.

*R. V. Fletcher* and *T. J. Wills,* for appellant.

512

514

*Mounger & Mounger, Hall & Hall* and *Davis & Conner,* for appellees.

COOK, J. The appellees, Mrs. Lucille Simmons and her minor son, William E. Simmons, Jr., instituted suit in the circuit court of Marion county for damages for the alleged wrongful injury and death of William E. Simmons, deceased, the husband and father, respectively, of the appellees, and from a verdict for the plaintiffs for thirty thousand dollars this appeal was prosecuted.

The declaration is very long, but the allegations thereof necessary to be here stated are substantially as follows:

That on the 2d day of January, 1927, the defendant operated a railroad through Marion county; that there was a public road in that county known as the Columbia and Baxterville road, the general course of which was the same as that of the railroad, which was approximately northwest and southeast, and said roads were so constructed that there was a crossing at a point about half a mile west of the Lamar county line; that on said date, the said William E. Simmons, in company with his fourteen months old child and the plaintiff William E. Simmons, Jr., was traveling over said public road by automobile, and while in the observation of reasonable care when crossing said railroad was injured by a train

negligently operated over said crossing at a high and excessive rate of speed; and that from the wounds so received, the said Simmons died shortly thereafter.

It was further alleged that the said crossing, as then and there kept and maintained, was an unsafe and dangerous one; that as a traveler approached the crossing from the west, as decedent did on the occasion when he was injured and killed, he would be traveling somewhat parallel with the railroad on the north side thereof, but the railroad would be entirely out of sight by reason of the fact that at that point it is constructed in a deep cut and on a long, sharp curve, while the public road is on a high hill and there intervenes between the railroad and the public road the side of said deep cut, as well as a growth of trees and underbrush; that in approaching said railroad, the public road curves sharply to the right and goes down a steep grade as the road turns to cross over said railroad to the south side; that said grade continued all the way to the track of said railroad, and across the north rail thereof, and finds its lowest point at the place where the south rail of said railroad crosses the public road; that the public road as it approached the railroad was very narrow, and was constructed out of loose sand and gravel, and by reason of the manner in which it was constructed ditches or depressions were washed in the center of said road, making it impossible, except with great caution, for two cars to pass on said road at that point; that as the public road leaves the railroad on the south side, it goes straight up a hill on a very steep grade, which begins at the south rail of the railroad; that the road passes between high embankments which cut off the view of the railroad in either direction; that the public road as constructed on the defendant's right of way on the south side is narrow and on a steep grade, and is constructed of loose sand and gravel, and the traveled portion is so closed in by ditches on either side, and especially near the railroad track, that only one

car or vehicle could pass, and one car on the public road would block it; that the condition of said crossing as kept and maintained at that time was such that cars meeting at or near said crossing were delayed, and were liable to be detained immediately upon said crossing; that the said crossing was also unsafe and dangerous for the reason that the part of said railroad lying to the east of said crossing was constructed on a curve and in such a way that a train approaching said crossing from the east would be running on a long curve, turning at all times to the left, and before reaching said crossing would pass into a cut, with a high embankment on the south side of the railroad, which projected itself between the train and the point where the public road crosses the railroad, so as to cut off the engineer's view of said crossing until the train was close to it; that for a long distance before the railroad reaches said crossing, and to the east of same, and for a long distance west thereof, the railroad goes down a very steep grade, which had a tendency to cause a train approaching said crossing to run rapidly and with less noise than trains usually make on ordinary tracks; that the said railroad company had failed to construct and maintain said crossing with easy grades in the highway so that the railroad could be conveniently crossed; that neither the railroad company nor the county so constructed and maintained said highway, and that the same was in bad order, unsafe, and dangerous; and that the defendant knew of this unsafe and dangerous condition of the highway, and, consequently, should have operated its trains over this crossing with great care and caution, but neglected and failed to do so.

It was further alleged that the defendant caused the train in question to approach the said crossing at a high, rapid, and excessive rate of speed, and neglected either to cause a bell to be rung or a whistle to be blown for a distance of at least three hundred yards from the place

where the railroad crosses said highway, and neglected to keep said bell ringing or whistle blowing until the engine stopped or crossed over the highway at said crossing; but, on the contrary, neglected and failed to cause the whistle to be blown or a bell to be rung at any time until the train was in thirty or forty feet of said crossing; that it then and there caused its train in approaching said crossing to run down a steep grade without making the noice usually made by trains running on ordinary tracks, and without giving any warning whatsoever, while the decedent's car was detained on said crossing with the way in front of him blocked by another car immediately in front of his car, and occupying the entire width and passable portion of said road; that while decedent's said car was halted and detained on said track, and while his two children were in said car as it stood upon said crossing, the said train approached with such rapidity that the said decedent did not have time, nor was it in his power, either to get said car off the crossing or to get his children out of said car, or to get out of the way of the train, and by reason thereof, while he was attempting to get his children out of said car, he was struck by the train so negligently operated.

The declaration further alleged that the proximate cause of the death of the said W. E. Simmons was: First, the negligence of the defendant in failing to maintain said crossing, within the limits of its right of way, with proper and easy grades so that said railroad could be conveniently crossed, and its failure to keep said crossing in good order; second, the negligence of the defendant in operating its train over said crossing at such a high and excessive rate of speed, while knowing the condition of the crossing, and that it was not in good order, and knowing that by reason of the manner in which it was kept and maintained it could not be conveniently crossed; and, third, the negligence of the defendant in operating its said train as it approached said crossing

at a high, rapid, and excessive rate of speed, neglecting at the same time to blow a whistle or ring a bell at a distance of three hundred yards from the place where the railroad crosses said highway, and the failure to keep such whistle blowing or to keep such bell ringing until the engine stopped or crossed over said highway—it being alleged that all these omissions and acts of negligence contributed to the injury and death of decedent.

The facts shown by the evidence are substantially as follows:

The decedent, William E. Simmons, was thirty-four years of age, and was born and reared in Pike county. At the time of his injury and death, he was teaching school at Eureka, in Lamar county, and for the four preceding years had taught at Carnes, in Forrest county. He owned a farm in Pike county, and during the five years he was teaching in Lamar and Forrest counties he made frequent trips to and from his farm, passing along the highway over the crossing in question. At the point where this highway crosses it, the railroad runs in a general northwesterly and southeasterly direction, but at the point of intersection runs almost east and west. The crossing is on what is known as "Hub hill," and from a point in the valley several miles north of this crossing to a point south thereof the railroad is constructed on a steep grade, and in making this steep ascent it makes numerous curves, following the cuts and ravines in this hill. The railroad was constructed many years ago, and some time after its construction there was a highway laid out and maintained on the north or east side thereof, which runs in the same general direction as the railroad up this hill, but did not cross the railroad until it reached a point near Baxterville about a mile south of the point where the accident occurred. Several years ago the board of supervisors of Marion county changed this highway so that from a point one hundred and eighty-five feet from the railroad on the north or eastern

side thereof, the highway was turned in a southerly direction at a sharp angle on the hillside, and constructed to run down the hill to the railroad track and up a hill on the other side, the railroad track being at the lowest point between the crests of the two hills. From the crossing where the accident occurred to the apex of the hill on the highway north of the crossing is eight hundred seventy-five feet, while it is one quarter of a mile from the railroad track to the apex of the hill to the south. From the point of deviation of the highway from its old course on the north side of the railroad to the track is one hundred eighty-five feet, and fifty feet of this distance was on the railroad right of way. The elevation from the railroad track for the first fifty feet or to the edge of its right of way, is forty-four inches; for the next fifty feet, or the first fifty feet off the right of way, the rise in the grade of the highway is fifty-three and three-fourths inches, while the rise in the grade of the next fifty feet going north is fifty-seven and three-fourths inches, making the rise in the grade, or the elevation, of the first one hundred feet off the right of way, one hundred eleven and one-half inches, and the grade or elevation in the highway continues for seven hundred thirty-five feet further north.

On each side of the railroad, and fifty feet from the track, the railroad company had erected the regulation Mississippi law stop signs, and on the highway three hundred yards back from the crossing on each side of the railroad toward the north and the south it had erected signs that read, ''Danger, Railroad Crossing Three Hundred Yards Ahead.''

The evidence further shows that the decedent owned and was driving a Chevrolet touring car, and there is evidence tending to show that the brakes thereon were in a defective condition. At the time of the accident, a Gulfport car driven by one Cyrus Reddick, which was traveling north, had passed over the crossing, and when

just opposite the Mississippi law stop sign it met a car going south which was driven by W. H. Crews. Reddick testified that the road at that point was not wide enough to permit the cars to pass conveniently, and for that reason he was compelled to pull to the side of the road into a ditch and stop, and that when Crews' car was just opposite him he slowed down and stopped; that at that moment the decedent, Simmons, came down the grade in his car, traveling in the same direction as Crews, and bumped into the back of Crews' car and caused it to run down the grade to and across the railroad track, Simmons' car all the while continuing to bump into Crews' car.

Crews testified that just as his car cleared the railroad track he applied his brakes so as to stop it and hold it. Simmons' car, which was immediately behind and against Crews' car, was thus blocked and held on the railroad track. Just about the time the car came to a stop on the railroad track a train came from the south around the curve in the track; and the testimony is undisputed that a person on the track at the crossing could see a train approaching from the south for fifteen rail lengths or four hundred ninety-five feet, while at the point where Crews was sitting in his car it could be seen for only a short distance.

The witness Reddick testified that about the time that Simmons' car stopped on the track he heard the train coming; that he looked through the back curtain of his car and saw Simmons apparently reaching into the back of his car; that as the train approached this crossing the bell was not rung nor the whistle blown until the train was within about seventy feet of the crossing.

The witness Crews testified that when Simmons' car bumped into his car, it caused his car to run across the track, Simmons' car being immediately behind his car; that about that time the train came into his sight around the curve about sixty feet away; that he applied his

brakes to hold his car in the position it then was; that the train whistle gave several short blows just as it came into his sight, and the bell was then ringing, but that if the whistle was blowing or the bell continuously ringing for three hundred yards before it reached the crossing he did not hear it. Several other witnesses, who were on the highway several hundred yards away from the crossing, but who were aware of the fact that the train was passing north, and were within three hundred yards of the railroad track, testified that they heard the whistle blow, but did not hear the bell, and that if the whistle was continuously blown for three hundred yards from the crossing or the bell was continuously ringing for that distance, or from the crossing south of the crossing where the accident occurred, they did not hear it.

The engineer and the fireman, as well as other witnesses for the defendant, testified that the bell had been continuously ringing from a point south of a crossing a mile or more south of the crossing where the accident occurred, and that as the train approached the crossing where the accident occurred the regular crossing signal was blown. The engineer also testified that, on approaching the crossing, he was on the outside of the curve, and for that reason he could not see the crossing, and was watching the fireman; that when about three hundred fifty feet from the crossing the fireman gave him a signal for an emergency stop; that he applied his emergency brakes and blew his whistle a continuous blast; that he did not come out of the curve so that he could see the crossing until the front of his engine was about eighty feet from the crossing; that he then saw Simmons step on the track and flag, and then turn and apparently try to push the car off of the track; that when the front of the engine was within about twenty feet of the crossing it obstructed his view of Simmons; that the train was traveling about twenty-five or thirty miles per hour and was stopped in about six

hundred feet, the rear end of the train stopping about sixty feet from the crossing, and the front end about two hundred fifty feet.

The fireman testified that on approaching this crossing the engineer blew the crossing signal, and that the bell had been continuously ringing for more than a mile; that when the train came around the curve so that he could see the crossing he saw a car on the crossing, but on account of the swing of the locomotive and its outward movement around the curve he thought at first that the car was moving; that as soon as he discovered that the car had stopped, he notified the engineer and flagged him down; that he was about fifteen rail lengths from the crossing when he first saw the car; that it took two or three seconds for him to discover that the car was not moving; that when he gave the signal, the engineer put on the brakes in emergency and grabbed the whistle; that he continued to look ahead and saw the man get out of the car, walk around it, and flag once, and then begin trying to push the car off the track; that he continued to look at him until the train got almost to him, when he (the witness) crossed to the engineer's side and jumped from the cab, landing in the public highway.

The automobile, its occupants, and Simmons were struck and thrown some distance down the track, Simmons and his baby receiving injuries from which they died a few minutes later.

There were many witnesses introduced at the trial of this cause, who testified in great detail and at length as to the conditions, facts, and circumstances leading up to and surrounding this unfortunate tragedy, and only this outline of the voluminous testimony can be here given without unduly extending this opinion; but we think the facts above stated, with others that will be hereinafter referred to, are sufficient to make clear the points to be decided.

The appellant assigns as error the refusal of a peremptory instruction requested by it and the granting of several instructions requested by the appellees.

In support of the assignment that the peremptory instruction requested by it should have been given, the appellant contends: First, that there is no conflict in the testimony bearing upon the question as to whether or not the bell was ringing continuously for a distance of more than three hundred yards from the crossing; and, second, that whether the whistle was blowing or the bell ringing previous to the time the train came in sight of the crossing had no causal connection with the injury sustained by Simmons on the crossing. Upon the latter point, it is argued, in effect, that the evidence shows that Simmons was operating his car with insufficient brakes, and in going down this hill from a point two hundred ninety-five yards from the railroad crossing he placed himself in a situation which caused his car to be running at such speed, and to have gained such momentum, that it was beyond his control, and that at the moment he struck Crews' car and knocked it across the railroad track and placed his car on said track the train was not within the three hundred-yard limit on which the law requires the whistle to be blown or the bell to be rung continuously until the crossing is reached; consequently, the blowing of the whistle or the ringing of the bell for three hundred yards could not have arrested the progress of Simmons' car or prevented it from going on the track, or in any way changed the situation that placed him and his car on the track in front of the moving train, and could not have prevented the accident.

Upon the point as to whether the whistle was blown or the bell rung continuously for three hundred yards before the crossing was reached, as required by law, we think there was sufficient conflict in the testimony to require the submission of this question to the jury. Upon the second point embraced in the above-mentioned ar-

gument, it is undoubtedly true that the giving of the statutory signals would not have prevented Simmons' car from going onto the track and becoming blocked thereon. But this fact alone did not relieve the appellant of the necessity of giving such signals as a warning of the approach of a train, and does not relieve it of liability for a failure to give such signals. Travelers on a highway have a right to insist that these signals be given not only that they may keep off the track, but that they may extricate themselves and their property from a position of danger before the arrival of the train. *Jones* v. *Railroad Co.*, 75 Miss. 972, 23 So. 358; *Railroad Co.* v. *Crominarity*, 86 Miss. 469, 38 So. 633; *Skipwith* v. *Railroad Co.*, 95 Miss. 50, 48 So. 964; *Railroad Co.* v. *Hawkins*, 82 Miss. 209, 34 So. 323; *Fuller* v. *I. C. R. R. Co.*, 100 Miss. 705, 56 So. 783.

In the case of *Fuller* v. *Railroad Co.*, *supra*, in discussing the probable effect of the failure of an engineer to give a warning at the time he first might have seen the deceased, instead of giving the warning too late, the court said:

"The only warning that was given him was too late to be of any benefit whatever, as the train was upon him at the time the two short blasts of the whistle were given. 'Warning in all such cases' (and Mr. Fuller under the circumstances did not forfeit his right to be warned simply because he went upon the railroad track in front of an approaching train), as was said by the supreme court of the United States in *C. I. Co.* v. *Stead,* 95 U. S. 161, 24 L. Ed. 403, 'must be reasonable and timely, but what is reasonable and timely warning may depend on many circumstances. . It cannot be such if the speed of the train be so great as to render it unavailing. The explosion of a cannon may be said to be warning of the coming shot, but the velocity of the former generally outstrips the latter.' Even if the engineer had not made an effort to stop or check his train, but had contented

himself with giving the alarm at the point when he did see, or could have seen by the exercise of reasonable care on his part, the catastrophe in all probability would have been averted.''

If the statutory signals had been given, and the jury has found that they were not, it is entirely probable that Simmons could have removed himself and his children to a place of safety before the arrival of the train at the crossing. In the *Fuller case, supra,* the court said that Mr. Fuller went upon the railroad track in front of an approaching train, but that he did not for that reason forfeit his right to be warned. In the case at bar, there was no train in sight or known to be approaching when Simmons went upon the track on a public highway, and if the customary signal had been given, he might have avoided the dangerous situation in which he was entrapped. We think, therefore, the peremptory instruction was properly refused.

The appellant assigns as error the granting of an instruction which reads as follows:

''The court instructs the jury for the plaintiffs that it is the duty of every railroad company to cause each locomotive engine run by it to be provided with a bell of at least thirty pounds weight, or a steam whistle which can be heard distinctly at a distance of three hundred yards, and it is the duty of the company to cause the bell to be rung or the whistle to be blown at a distance of at least three hundred yards from the place where the railroad crosses over any public highway, and the bell shall be kept ringing or the whistle shall be kept blowing until the engine has stopped or crossed over the highway; and if the jury believe from the evidence in this case that William E. Simmons was killed at a crossing on a highway on the defendant's railroad by being struck by one of its engines running on said track, and if the jury further believe that the defendant negligently failed to cause said bell to be rung and negligently failed to

cause said whistle to be blown at a distance of at least three hundred yards from the place where said railroad crosses over said highway, and that as a proximate result of such failure on the part of the defendant company the said William E. Simmons was injured and killed, or if the jury believe from the evidence that the defendant railroad company was guilty of such failure, that is to say, if it negligently failed to sound the whistle as aforesaid and negligently failed to ring the bell as aforesaid, and that such failure contributed proximately to the said injury and death of the said William E. Simmons then it is the duty of the jury to find for the plaintiffs.''

In the first part of this instruction, the duty imposed upon a railroad company to give crossing signals, as provided by section 4045, Code 1906 (section 7964, Hemingway's 1927 Code) is correctly stated, but the appellant complains of the use of the word ''and'' instead of the word ''or'' in the sentence reading, ''if the jury further believe that the defendant negligently failed to cause said bell to be rung *and* negligently failed to cause the said whistle to be blown,'' etc. There is no merit in this contention. The use of the word ''or'' in this sentence would have made the instruction erroneous, for the reasons that it would then have required the railroad company to give both signals in order to free itself of fault. As written, it informs the jury that the appellant was negligent only in case it failed in its duty in both respects, and when the entire instruction is read together, it is not misleading.

The appellant next complains of an instruction granted the plaintiffs which reads as follows:

''The court instructs the jury, for the plaintiffs, that it was the duty of the defendant to so construct and maintain within the limits of its right of way a crossing that the same could be conveniently crossed, and if grades were necessary in order to bring the public road

down to the level of the railroad track at the crossing, the company should have constructed such grades within the limits of its right of way as would make the crossing easy and convenient, and if the jury believe from the evidence in this case that the defendant, the Gulf & Ship Island Railroad Company, negligently failed to construct and maintain the crossing at the place where Mr. Simmons was killed with proper and easy grades so that said crossing could be conveniently crossed, and if the jury further believe from the evidence that William E. Simmons, the husband of the plaintiff, Lucille Simmons and the father of the plaintiff William E. Simmons, Jr., was a traveler upon this road and at this crossing, and that the defendant's trains ran against him and struck him while on said crossing and that this wounded him and caused him to suffer and die, and that the proximate cause of his death was the negligent failure of the defendant to construct and maintain said crossing within the limits of its right of way with proper and easy grades, or if the jury believe from the evidence that the defendant negligently failed to construct and maintain said crossing within the limits of its right of way with proper and easy grades so that said road could be conveniently crossed, and that this failure proximately contributed to the injury and death of William E. Simmons, then it is the duty of the jury to find for the plaintiffs.''

This instruction bases the right of recovery, if any, on account of the condition of the crossing, on the proposition as to whether or not the grades within the limits of the railroad's right of way were such as to make the crossing easy and convenient. Section 4053, Code 1906 (section 7903, Hemingway's 1927 Code) provides that:

''Where a railroad is constructed so as to cross a highway, and it be necessary to raise or lower the highway, it shall be the duty of the railroad company to make proper and easy grades in the highways, so that the railroad may be conveniently crossed, and to keep such crossings in good order.''

And in the case of *Railroad Company* v. *Sneed,* 84 Miss. 252, 36 So. 261, in discussing the extent of the duty imposed upon railroad companies by this statute, the court said:

"That duty is as follows: In order that public travel may not be interfered with, nor the rights and privileges of the public in any wise curtailed, the railroad company is required to make such necessary and easy grades as will permit safe and convenient passage over its roadbed. The grade required depends, of course, upon the extent to which it has been found necessary to raise or lower the natural surface of the ground to make the crossing accord with the established grade of the railroad. Whether such grades are to be slight or great varies at each crossing with the natural obstacles which may be presented by the particular location. It is further the duty of the railroad company to see that the crossing is in such condition that the highway can be safely and conveniently used by the traveling public generally. This is the extent of the duty imposed upon railroad companies by the statute under review."

Under this statute it is not the duty of the railroad to make such grades as will make the crossing of its roadbed safe and easy under any and all circumstances, but only to make such necessary and easy grades as will permit safe and convenient passage over its roadbed by persons using reasonable care in the use thereof. The evidence is undisputed that the grade of this highway for the fifty feet from the railroad track to the edge of the right of way is a little more than seven per cent., while the grade of the first fifty feet off the right of way is practically nine per cent. The railroad company had no control over or right to determine and fix, or change, the grade of the highway of its right of way and was under no duty in that regard. The proof shows that it constructed grades within the limits of its right of way to conform to and connect with the grades of the highway

as maintained by the county authorities. If the grade within the limits of the right of way had been materially lowered, there would have been created a precipitous drop in the highway at the edge of the right of way, which in itself would have constituted negligence on the part of the company, and would have violated the statutory duty to make proper and easy grades in the highway so that the railroad may be conveniently crossed.

This instruction predicated liability solely upon a negligent failure of the appellant to construct and maintain necessary and proper grades within the limits of its right of way. While one witness testified that on Federal aid highways a grade of over six per cent. was not permitted, and that the grade in the hill here in question was from twelve to fifteen per cent., it appears to be conclusively established by witnesses for the plaintiffs, who at the instance of the plaintiffs actually surveyed and measured the elevation from the track to the edge of the right of way, that such elevation was forty-four inches, or a grade of seven and one-third per cent. This grade is less than that of the highway just off the right of way to which it joined and conformed, and we do not think that under the evidence in this case liability can be predicated alone upon a failure of the appellant to make such necessary and proper grades as will permit safe and convenient passage over its roadbed. We conclude, therefore, that it was error to grant this instruction.

The appellant also complains of the following instruction granted to the plaintiffs:

"The court instructs the jury for the plaintiffs that in all actions brought for injuries where such injuries have resulted in death, the fact that the person injured may have been guilty of contributory negligence shall not bar a recovery."

There was no error in this instruction. It merely informed the jury that contributory negligence on the part of the person injured does not bar a recovery, and it did

not preclude the jury from diminishing the damages "in proportion to the amount of negligence attributable to" the deceased. The appellant secured an instruction to the effect that the deceased was guilty of gross negligence in driving down onto the railroad track in the manner shown by the evidence, and that if the jury found for the plaintiffs, the amount of damages should be diminished in proportion to the amount of negligence attributable to the deceased. This instruction supplements the plaintiffs' instruction, and when the two are read together they announce the entire statutory law upon the subject as found in chapter 312, Laws of 1920 (section 516, Hemingway's 1927 Code). *Railroad Co.* v. *Archer,* 113 Miss. 158, 74 So. 135.

The appellant also complains of certain instructions authorizing the jury, if they found for the plaintiffs, to take in consideration, in assessing the damages, the mental and physical pain, if any, suffered by the deceased between the time of his injury and the time of his death. The evidence shows that Simmons' body was greatly mutilated and torn, and that he was breathing or struggling for breath immediately after the accident, but was apparently unconscious. Immediately after the train was stopped, he was placed on a stretcher, and then on the train, and the train then started for the next station; but Simmons died in a very few minutes thereafter. We have carefully examined the evidence upon this point, and we do not think it was sufficient to warrant the conclusion that the injured man was ever conscious or in condition to suffer pain after he was struck and injured, and, consequently, we think it was error to submit this issue to the jury.

For the errors herein indicated, the judgment of the court below will be reversed and the cause remanded.

*Reversed and remanded.*