HENRY HAYDEN *v.* STATE OF MISSISSIPPI.

PHYSICIANS. *Practice of medicine. License. Osteopathy. Code* 1892, §1258. *Laws* 1886, *p.* 79.

A practioner of osteopathy, who treats diseases only by manipulation of the patient's limbs, muscles, ligaments and bones, does not practice medicine within the meaning of code 1892, §1258, and laws of 1896, p. 79, chap. 68, forbidding the practice of medicine without license, and defining the practice of medicine as meaning "to prescribe or direct for the use of any person any drug, medicine, appliance or agency . . . for cure of any disease, fracture, wound, etc."

FROM the circuit court of Alcorn county.

HON. EUGENE O. SYKES, Judge.

Hayden, appellant, was convicted of practicing medicine without a license so to do, and appealed to the supreme court. The facts are stated in the opinion of the court.

He made a previous effort to appeal from the verdict of the jury, before judgment, but the appeal was dismissed. See *Hayden* v. *State, ante* 55.

*J. A. P. Campbell* and *Boone & Curlee,* for appellant.

The question is as to the meaning of the term "physician" in § 1258 of the code. The implication of the section is that he may be examined and get license, mere mockery if he cannot. Section 3243 of the code requires every person who desires to practice medicine to obtain license, and by § 3244 every such person must be examined upon, among other things, "materia medica" and "surgery" while the next section speaks of "medical studies," "medical lectures" and "medical schools," "practice of medicine," etc.

Provision is made for licensing all named in § 1258 as prohibited from practicing without license showing that those

made subject to a penalty for practicing without license are those for licensing whom provision is made by the code.

Physis is medicine, drugs, and a physician is one who uses medicine; a surgeon is one who uses instruments and performs operations with them.

The requirement of proficiency in materia medica as a condition of obtaining license to practice as a physician is to prohibit from practicing as physicians in the large sense of ministering to the suffering all who do not rely on drugs and would embrace nurses and many others and would not be constitutional according to *State* v. *Gravett*, 65 Ohio St., 749.

The true view is maintained by *Smith* v. *Lane*, 24 Hun., 632; *Nelson* v. *State of Kentucky*, Ky. Ct. of Ap., reported in 50 L. R. A., 383; *State* v. *Liefring*, 61 Ohio St., 39.

The cases in other states are on statutes widely different from ours and do not conflict with the views contended for in this brief. The case of *Eastman* v. *The People*, 71 Ill., App. Ct., 206 is clearly right and doubtless those from other states are so, but it is just as clear that our statutes do not embrace osteopaths or any others who do not practice medicine.

The act of March 19, 1896, acts p. 79, makes clear beyond dispute the meaning of " physician " and practicing medicine as dealt with by our law and certainly the writer of that act had never heard of osteopathy or did not intend to include it in the act.

It is clear that an osteopath cannot obtain license for the prescribed examination excludes him, and no state board would grant him license. The facetious brief of the attorney-general is an argument in favor of a law requiring osteopaths to be examined as to qualification in their profession and to that they have no objection, their complaint is that they cannot get license and yet are prosecuted for not getting it.

*Monroe McClurg*, attorney-general, for appellee.

January 15, 1815, is the earliest date of the English statute

requiring that every medical man should give evidence that he possessed some knowledge of his profession before he began to practice, and that all apothecaries, who were then a class of physicians, should be licensed. Then, as now, it was charged that selfish · purposes actuated the law, but it is an historical truth, that with "The Apothecaries' Act" began a revolution in medicine. Cuppers, leechers, bleeders, herb-doctors, and all kindred classes began to lose ground. They are not all dead yet, but their ranks are thin. The English act has been, in some form, followed in this country. Many states have similar statutes. That they are wise and have been a great blessing to mankind will not be questioned. The great controlling purpose has been to benefit mankind, not merely by undertaking to regulate the use of any drug in a scientific manner, not to regulate the practice of medicine artfully, but by laws which will protect the public, not against a certain class of physicians, but against all persons whomsoever who shall undertake to minister unto them for their ailments. Our statute, at least, cannot fairly be given the narrow construction contended for by appellant. The history of our legislation on this subject justifies and demands a broader construction; and looking at the legal history in the light of general history on this subject, it is next to preposterous to contend for limitations short of the general good in its broadest sense. Dentists and pharmacists are likewise required to be licensed. In short, the broad purpose is to weed out the incompetent men, rather than the inefficient remedy or the hurtful drug. When we secure a competent man, the pure "drug," the correct "agency," the scientific "appliance" follows.

The defense rests upon the mistaken idea that the practitioner of osteopathy is to be skilled alone in the art of manipulation; that it is not essential for him to be able to make a scientific diagnosis. Art is what we may do; science is what we know. Art and science are both required in the practice and knowledge of osteopathy. The practitioner must know

scientifically what bone is fractured, what nerve or blood vessel is pressed, what muscle is diseased, in order to understand what manipulation is needed, and then be able to skillfully, or artfully, apply the manipulation to secure the desired effect. The osteopath, the same as the allopath, the homœpath · or the practitioner of any other school, claims to possess both the science and the art desired by the patient; hence, on foundation principles, there is no difference between them.    It is but common knowledge that he who treats by manipulation, the bones, muscles and ligaments of the human body for any of the countless ailments of which they are susceptible, should possess at least as high a degree of the knowledge of the science of physiology, or anatomy, or of hygeine, or of medical botany, as the one who treats by some other method.    "Treats" and "practice" are synonymous as used in this connection. There can be no reason for any substantial difference.

The real defense is not that the appellant is not a physician, but that the statute is not broad enough to include his particular class or school of doctors.    The purpose of the act of 1896, as gathered from its title as well as from the context, is to "define the practice of medicine."    That the practice of medicine is not limited by the act of drugs, or to allopathic· practice is plain; any "drug," any "medicine," any "appliance," or any "other agency," either of which is "material" or "immaterial."    "Appliance" is not used here strictly in a mechanical sense, nor does "other agency" refer to the same kind of drugs, medicine or appliances, but to any other thing except those used to the same end as those things are used, namely, "the cure, relief or palliation of any ailment or disease of mind or body, or for the cure or relief of any wound, or fracture, or other bodily injury or deformity."    The plain, unambiguous language of the statute is a rule of construction sufficient unto itself.    Its humane purpose is to protect the public from the dangers of pretenders and impostors.    One afflicted with a broken limb, or rheumatic muscles, may suffer

as much injury from unskilled manipulation as from ineffectual medicines or medicines unwisely administered. Indeed, the words "appliance" and "other agency" so far from being words of limitation broaden the statute to include even "faith doctors" and "christian scientists." Mental application is a cure, or the agency of faith, rest, air, water, light, and numberless other practices, are the "agencies" contemplated by the statute. So, the argument that the law does not include manipulation scientifically and professionally administered or applied is answered by the statute itself. 23 Am. & Eng. Ency. Law, p. 442, notes 3 and 4, and *Ib.*, 446–70, notes. The case of *Bragg* v. *State*, Alabama, reported in 32 So. Rep., 767, takes the correct view of the question. The Ohio, Rhode Island and Kentucky cases cited by counsel, 61 Ohio St. 30, and 40 Ohio, N. P. 163 and Mylod's case (Rhode Island) 41 L. R. A., 428, and Nelson's case, 22 Ky., 438, are not only upon narrow statutes, but the reasoning of the courts in those cases is too much restricted. The Alabama case is respectfully commended to the court as announcing the correct rule upon this subject, especially in showing what "the practice of medicine" means, and that the osteopath comes clearly within the true definition. See also in point Little's case, 51 L. R. A., 717.

In the July, 1902, Journal of Osteopathy, published by the American School of Osteopathy, at Kirksville, Mo., may be found the definition of osteopathy, as given by Dr. A. F. Still, who is the originator of that science. It is as follows:

"Osteopathy is that science which consists of such exact, exhaustive, and verifiable knowledge of the structure and functions of the human mechanism, anatomical, physiological and psychological, including chemistry and physics of its known elements, as had made discoverable certain organic laws and remedial resources, within the body itself, by which nature, under the scientific treatment peculiar to osteopathic practice, apart from all ordinary methods of extraneous, artificial, or

medicinal stimulation, and in harmonious accord with its own mechanical principles, molecular activities, and metabolic processes, may recover from displacements, disorganizations, derangements, and consequent disease, and regain its normal equilibrium of form and function in health and strength.''

From the July-August, 1902, Boston Osteopath, the following definition is taken:

'' Osteopathy is a therapeutic science grounded upon known and verifiable laws of physiology. From these principles we deduct our definition of the science:

'' 'Osteopathy is a method of treating disease by manipulation, the purpose and result of which is to restore the normal condition of nerve control and blood supply to every organ of the body, by removing physical obstruction, or by stimulating or inhibiting functional activity as the conditions may require.' ''

The October, 1901, number of the Osteopathic Physician, published at Chicago, gives the following:

*Q.* What is osteopathy?

*A.* The latest development of medical science, constituting an entirely new and complete practice, most successful in treating human ills, both medical and surgical, by skilled manipulations which enable nature to do her allotted work without recourse to knife or drugs.

*Q.* What does the word mean?

*A.* It comes from the Greek osteon, bone and pathos, disease—which latter has come to signify the system of treating disease indicated by its prefix. The derivation of a name, however, cannot explain the philosophy or practice of a school of medicine. The propriety of the name will be manifest to any one who reads this journal.

*Q.* Does osteopathy teach that the bones are usually diseased?

*A.* Absolutely no.

*Q.* Is it only a treatment for bone diseases?

*A.* No. It is a complete system, applicable to all diseases.

*Q.* Do you prescribe drugs at all?

*A.* Not to induce the body to perform its proper work. We use drugs to antidote poisons, of course, and as antiseptics, in accordance with the demands of hygiene, to destroy bacteria which threaten to invade the human tissues; but that is a very different thing from using drugs upon the body itself. We also approve thoroughly of anesthetics in surgical operations. In rare instances we may countenance the use of opiates, but never to supplant more rational treatment which might cure the cause of pain."

On page 227 of the July, 1902, Journal of Osteopathy, on the subject of "Legislation," J. L. Harwood, Esq., of Kirksville, says:

"The osteopath needs no protective legislation, and should ask for none. All the osteopath wants is an even chance with all other systems in the field of healing art."

These journals show that these physicians treat every class or kind of disease treated by any other school, such as eye, ear, heart, lungs, liver, kidney, stomach, intestinal, dislocations, deformities, bladder and urethae, nervous diseases, obstetrics, etc., and general diseases.

TERRAL, J., delivered the opinion of the court.

Hayden was indicted in the circuit court of Alcorn county for practicing as a physician without first having been examined and obtained a license so to do. The facts of his alleged offense were admitted to be as follows, and upon this admission the case was submitted to the jury: "That the defendant practiced in this (Alcorn) county what is known as 'osteopathy' in the American School of Osteopathy, in Kirksville, Mo., from which school he is a graduate. That in treating diseases, and in his treatment of the witnesses for the state in this case, to-wit, W. W. Kemp and James A. Carter, he did not use any drug or medicine, but his treatment consisted of manipulating scien-

tifically the limbs, muscles, ligaments, and bones which were pressing on the nerves of the blood supply. This treatment was had so that nature would have free action. That in his treatment of. diseases or pains he is confined solely to his manipulation as above described. That for said services to said Carter and Kemp he received pay. The witnesses were being treated for rheumatism, and claimed that they have entirely recovered, as a result of this treatment.'' The above is agreed as being all the facts in the case. The court instructed the jury that, if they believed the admitted facts, they should convict the defendant. This they did, and thereupon the court imposed a fine of $20 upon the defendant. From this judgment he appeals.

The sole question is whether, under ch. 68, acts 1896, an osteopath is required to be examined and licensed for the practice of his branch of the healing art. The act of 1896, so far as it is necessary to be known for the right understanding of this case, provides: '' That the practice of medicine shall mean to suggest, recommend, prescribe, or direct for the use of any person, any drug, medicine, appliance or agency, whether material or not material, for the cure, relief or palliation of any ailment or disease of the mind or body, or for the cure or relief of any wound or fracture or other bodily injury or deformity, or the practice of obstetrics or midwifery, after having received, or with the intent of receiving therefor, either directly or indirectly, any bonus, gift, profit or compensation.'' It is perfectly manifest, as we think, from the agreed statement of facts, that Hayden used neither drug nor medicine, as meant by the act of March 19, 1896. It is equally manifest to us that the legislature, by the use of the words ''appliance and agency,'' did not intend to include such treatment as Hayden gave Carter and Kemp. Our attention has been called to no statement of osteopathic treatment in all the literature upon this subject which characterizes the treatment of an osteopath of his patient as an appliance or agency. There is an incon-

gruity in such application of such words. Osteopaths themselves do not speak of their manipulation of the nerves, ligaments, bones, and other parts of the human body as being agencies or appliances of any sort or in any sense. In any strict and proper use of such words, they cannot be so denominated. If one not an osteopath directs a blow at their art, it is becoming that he use a term of description not to be mistaken. We conclude that the act of March 19, 1896, was not intended to regulate the practice of osteopathy in Mississippi. The course of study and examination prescribed in our law upon this subject seems to mark it out as a curriculum of the allopaths. It at least suits them in many respects, but its chemistry and materia medica are not specially adapted to assist the practice of osteopathy. They make no use of the immense learning contained on these subjects, so highly valued by the regular physician. It appears to us that our legislation upon the subject of the practice of medicine has been framed by the allopaths to suit their views of the medical art, and with the laudable design of excluding from the practice the unskillful and the ignorant; and it was not intended to set up a universal standard of therapeutics, from which none could depart. Courts in other jurisdictions where similar statutes prevail, have led the way for our decision in this case. While our own views of the subject would probably have led us to the conclusion we have reached, yet, if the case had been otherwise, we should have felt ourselves strongly constrained by the authority and reasoning employed by them. We refer to *State* v. *Liffring*, 61 Ohio St., 39 (55 N. E., 168; 46 L. R. A., 334; 76 Am. St. Rep., 358); *State of Rhode Island* v. *Mylod*, 40 Atl., 753 (41 L. R. A., 428); *Nelson* v. *Board* (Ky.), 57 S. W., 501 (50 L. R. A., 383). Alabama, with a statute widely different from ours, holds another view. But *Bragg* v. *State,* 32 South., 767, sheds no light upon the construction of our statute.

A wise legislature some time in the future will doubtless make suitable regulations for the practice of osteopathy, so as

to exclude the ignorant and unskillful practitioners of the art among them. The world needs and may demand that nothing good or wholesome shall be denied from its use and enjoyment.

*The judgment below is reversed, the indictment quashed, and the defendant discharged.*