# COTTON MILL PRODUCTS CO. *v.* OLIVER.*

Division A. March 11, 1929.)

[121 So. 111. No. 27414.]

*Corpus Juris-Cyc References: Damages, 17CJ, section 453, p. 1116, n. 6; Master and Servant, 39CJ, section 1326, p. 1134, n. 42. On excessiveness of verdicts in actions for personal injuries other than death, see annotation in L. R. A. 1915F, 30; 46 A. L. R. 1281.

*Bratton, Bratton & Dailey* and *Holmes & Holmes,* for appellant.

370

*Barbour & Henry,* for appellee.

Argued orally by *J. G. Holmes,* for appellant, and *J. F. Barbour,* for appellee.

McGowen, J. Appellee, A. L. Oliver, sued the appellant, Cotton Mill Products Company, for damages for the

loss of his right eye while he was employed at the appellant company in Yazoo City.

The declaration in this case contained four counts, on two of which there were peremptory instructions, and, on the other two, the court below submitted to the jury the question of negligence on the part of the appellant. In one of the counts it was charged that the appellant negligently failed to furnish the appellee with reasonably proper and suitable oil cans or other apparatus with which to oil the machinery in the spinning room, the oiling of which machinery was the duty required of him and in the performance of which he was engaged at the time he received the injury. The other count alleged that the appellant failed to exercise reasonable care in the matter of making safe the place whereat the appellee was required to work, in that the Howard & Bullock spinning frame which he was required to oil was not kept equipped with a certain device known as an ''oil spout'' or ''oil snout,'' in which to place the oil so as to remove the necessity for the appellee, in performing his duty, to come in dangerously close proximity to the rapidly moving belts and pulleys which propelled the spinning frame.

Upon the submission of the case to the jury, a verdict was returned for twelve thousand five hundred dollars and a judgment entered by the court accordingly. From this judgment appellant appeals.

We shall not undertake to detail all the evidence in the case, but only what we conceive to be the essential facts.

The appellee was employed in the spinning room of the appellant company in which were operated twenty-four Howard & Bullock spinning frames, six Whiting frames, and six Fails & Jenks frames, or a total of thirty-six spinning frames. These frames were all propelled by pulleys which extended from overhead shafts to shafts on each of the frames, both shafts having pulleys thereon which were operated by bands; and, in order to spin cot-

ton, it was necessary that these pulleys be revolved at a very high rate of speed. The cotton frames were orderly arranged in the spinning room, each frame having a double row of spindles, and between the frames were alleys about sixteen inches wide, along which the appellee and those who dealt with the machinery passed in the performance of their duties. The pulleys came down from the overhead shaft to the shafts attached to the frame, as stated above; and the pulley nearest to the frame at which the appellee was injured was known as the "fast pulley," which propelled the frame, and the pulley furthest from it, and only a few inches apart, was the "slow pulley," which permitted the machine to stop motion when, by the use of a shifter, the belt was thrown upon that pulley. It was the duty of the appellee to oil the bearing just in the frame, about six to eight inches from the fast revolving pulley.

The "snout" which had been attached to the machine originally was a small, hollow pipe with an opening in the creel or table of the frame—the creel being the body of the frame—running down to and into the bearing, and it had been allowed to be taken from the machine. In oiling the machinery, it was necessary for the oiler to insert the oil can opposite the pulley and pour the oil from the can with the four and one-half-inch spout directly into the oil cup. It was contended that, had the oil snout been attached to the creel of the frame the oiler would have been able to stand erect when pouring the oil in at the top of the creel or table, and that he would not have had to put his hand close to the machinery, in close proximity to the rapidly moving belt, and that the oiling of the machinery could have been carried out without the risk of appellee having his hand or face in close proximity to this rapidly moving belt.

It was contended also that, even though the "snouts" were missing from the machine, by using an oil can with a nine-inch spout, the risk from having his face and hands

in close proximity to the revolving machine belt would have been obviated.

Appellee's evidence tended to show that the safe and proper way to oil the machine was by using an oil can with a nine-inch spout from the rear of the pulleys; and also that this process could be followed safely and properly by shifting the belt to the slow pulley. The evidence on behalf of appellant tended to show that the proper and safe way of oiling the machinery was between the belts from the side.

Appellee testified, and his proof tended to show, that he was oiling the machinery in the manner directed by his foreman; that he had been employed perhaps two months as oiler; and that he had been instructed not to oil from the side, because the oil would fall on the pulley, causing the belt to slip, and thereby produce trouble in the operation of the machine. He also stated that he used an oil can with a four and one-half-inch spout in doing the oiling, and that it was furnished to him by his foreman. Appellant contended that they furnished oil cans with nine-inch spouts, and that one was found in the oil room about an hour after appellee was injured.

The evidence showed that an oiler performed on an average five thousand oilings a day. The appellee was injured while oiling the machinery, in performing which act he occupied a stooping position; and the oil can in his hand, coming in contact with the rapidly revolving belt, was hurled from his hand, and the sharp point of the spout pierced his right eye. As a result of this accident great pain was endured by him for about thirty hours, or until his eye was removed.

Appellee testified that he continued to suffer until the trial of this case, some months after the injury, and that his left eye was affected in that its vision was impaired, and that the vision of his left eye had not since improved. Appellee was an able-bodied man, thirty-four years of age, and earning two dollars per day.

The appellant and a number of witnesses in its behalf stated that they had seen Howard & Bullock spinning frames operated in other cotton mills throughout this country, and that this snout was not in use in well-regulated cotton mills, assigning as a reason therefor that cotton would get into this small pipe and clog it, thereby rendering it difficult to oil the bearings.

The evidence of the appellee tended to show that these particular snouts on these machines had been in operation from the time of installation, a quarter of a century ago, and that some were in operation at the time of the trial. The oil can which appellee stated that he was using at the time of the injury is exhibited as evidence here, also the oil can with the nine-inch spout, contended by appellant to have been sent to the mill for use just before the injury occurred.

There was a sharp issue of fact as to whether or not appellee was required to use the short-spouted oil can; also as to whether or not the oil snout was a proper equipment on the Howard & Bullock spinning frame, and as to whether the proper method of oiling this frame was from the side or rear. The jury visited the cotton mill and saw the machinery in operation where Oliver was injured.

In its assignments of error, appellant contends, first, that it was entitled to a peremptory instruction in this case. A careful study of this record convinces us that on the two counts of the declaration, to which we have adverted, the court correctly submitted the issues of fact raised thereon to the jury. As to the use of oil snouts in other mills, this testimony is not conclusive. The issue is whether or not appellee had a safe place in which to work; that is, whether appellee standing in a narrow alley between rapidly moving machinery, not equipped with an oil snout (costing thirty-five cents each) and with a short-spouted oil can with which to oil the bearings, could safely perform his duties. We think this

is a question of fact for the jury to decide—whether or not a reasonably prudent man would provide such instrumentalities in such a place. It is not for us to substitute our opinion for that of the jury, where there is an issue of fact. We will say further, there were more witnesses who testified in behalf of appellant's theory of the case than in behalf of appellee's; but the jury saw and heard the witnesses, and saw the machinery in operation, and we cannot disturb their finding in such situation.

With reference to the second contention in the assignment of errors, at the beginning of appellee's testimony, when it was suggested that the jury repair to the mill to view the scene, appellant requested the court, in advance of this trip to its mill, and before appellee had concluded his testimony, to allow appellant to have a man demonstrate, with an oil can, how the machinery should be oiled. This request for a practical demonstration at the mill was refused by the court, which refusal is assigned as error.

We think it was entirely proper for the court to decline to allow this practical demonstration, for the reason that it was entirely within the discretion of the court to confine the scope of the testimony to the purposes and spirit of the statute, which permits a jury to view the scene; and in this case it would have been unnecessary at any rate, because the proof in this case abundantly shows that the oiler, performing this duty some five thousand times a day, had been able to do so without serious mishap until this occasion. We do not think it would have been fair to the appellee to permit this demonstration to the jury by a person specially prepared for this particular occasion, diverting the mind of the jury from the usual and ordinary way of doing this work from hour to hour, and from day to day; consequently, we think there was no error.

Third. There is some highly technical criticism of an instruction in this case, which we think is without merit; nor would any new principle of law be settled by a discussion thereof; but, conceding that the instruction is subject to criticism, the instructions, as a whole, stated the law of the case fairly for the appellant, and the trial of this case, from the beginning to the end, was most skillfully conducted, and the rights of the appellant were carefully guarded. Therefore, we find no reversible error.

Four. It is insisted that the verdict is excessive in this case, and a splendid brief in this connection has been presented to this court. Counsel cites the case of *P. Lorillard Co.* v. *Clay,* 127 Va. 734, 104 S. E. 384, in which authorities are reviewed, and in which a judgment for fifteen thousand dollars is reduced to ten thousand dollars for the loss of an eye. In this case it was found that the average verdict for the loss of an eye is something over five thousand dollars some verdicts being lower, and some higher than ten thousand dollars. However, the court said, in reducing the judgment, that passion and prejudice could be attributed to the jury for the reason that a very improper argument had been submitted by the appellee's counsel, into which class prejudice had entered, and through which argument ingenious counsel had been permitted to have full sway with the jury.

In the instant case we have no scales with which to delicately weigh the amount of suffering endured by the appellee before the removal of his eye. His suffering must have been intense and continuous for thirty hours. He stated that he continued to endure pain until the date of the trial, and that his other eye was materially affected. The jury saw and heard him, and we cannot say that the verdict is grossly excessive, nor can we say that it reflects passion and prejudice—especially in the light of the fact that this court knows that the purchasing power of a dollar since the World War has been reduced

 

to about fifty per cent of its value prior thereto. In other words, a verdict for twelve thousand five hundred dollars is not more than a verdict for eight thousand dollars prior to 1914.

The case has been fairly tried, and we do not feel that we can disturb this verdict.

*Affirmed.*