## S. H. Kress & Co. *v.* Sharp.

(Division B. March 3, 1930. Suggestion of Error Overruled, March 17, 1930.)

[126 So. 650. No. 28397.]

694

Amis, **Dunn** & **Snow**, of Meridian, for appellant.

**Reily & Parker,** of Meridian, for appellee.

Argued orally by **Ed. Snow,** for appellant, and by **Marion W. Reily,** for appellee.

**Griffith, J.,** delivered the opinion of the court.

Appellee, who will sometimes hereinafter be referred to as the plaintiff, was an employee of appellant in a re-

tail mercantile store operated by appellant in the city of Meridian. The position held by appellee was that of floor lady, and it was her duty to have, to some extent, a general superintendence over the saleswomen at the retail counters. Among other duties of appellee was that of vigilance to see that the counters were kept supplied, and that, when any particular merchandise should be sold out to see to it that the counter was immediately replenished by the stockmen, and, if the latter were otherwise engaged, it was the duty of the floor lady to go upstairs and bring down in her arms such quantity as could be conveniently carried in this manner. On the 21st day of December, 1927, appellee, while in the discharge of her duties last aforesaid, and while descending the stairway with four dozen bath towels in her arms, fell on the stairway and was injured. She instituted suit alleging that the stairs were unsafe in three particulars: That they were steep, narrow, and dark. After a trial lasting four days, the record of which embraces nearly six hundred typewritten pages, a verdict and judgment was entered in behalf of plaintiff for twenty-five thousand dollars, from which the defendant appeals to this court.

Fifteen witnesses, including plaintiff herself, all being young women who had been employed by appellant, were introduced by appellee on the issue of negligence. Ten of these testified that the stairs were too steep, twelve that they were too narrow, and thirteen that they were insufficiently lighted. None of these witnesses had made any measurements, and their estimates of steepness and narrowness were merely of varying opinion based upon observation. For instance, one of these witnesses, when pressed for an exact estimate of the width of the stairs, placed the width at twenty-one inches, another at thirty inches, and another at thirty-six inches. As to the width of the stair steps or the tread, one witness said they were only four inches; another said they were six inches; another that they were only seven inches; and so on.

Appellant introduced six witnesses who had made actual measurements of these stairs. Five of these witnesses were experienced carpenters, contractors, and builders, and the sixth was the city building inspector. By actual measurements, this stairway was forty-seven inches wide in the clear, the steps or treads were eleven and one-half inches wide, the rise seven and one-half inches; and every one of these practical builders stated that these dimensions and measurements were standard —that is to say, that a business stairway showing these measurements complies in every particular with the standard requirements observed in the architecture of such stairways in general and ordinary practice. No person other than these six witnesses had made any actual measurements, and their testimony as to the actual measurements stands undisputed. Nor did any witness dispute that these measurements were those of a standard stairway in common use everywhere in such establishments.

"The testimony even of disinterested and unimpeached witnesses on the subjects of measurements, distances and the like, which is based merely on memory, estimate or casual observation, must yield to that which is based on actual measurement." 1 Moore on Facts, section 415; 22 C. J. 738, 739.

We apply and adopt the language of the opinion in McIntyre v. Pittsburgh, 238 Pa. 524, 86 A. 300, which was a case wherein appellant had sued for an injury alleged to have been caused by the narrowness and steepness of a flight of steps, as is the case here. The court said: ".It was not contended, nor was there any evidence tending to show, that the steps were out of order in any way. Criticism was directed entirely against the manner in which they were constructed. It was claimed that they were too steep, and that the treads were not wide enough. It was not shown that the method of construction was unusual, or that it differed from the ordinary plan found

in such localities. It is the duty of the city to construct and maintain its public ways so that they shall be reasonably safe and convenient for ordinary use and travel. In performing this duty it is bound to use ordinary care and diligence, but it is not bound to provide against the possibility of an accident. . . . There was no eye-witness of the accident, and the explanation given by the plaintiff was by no means clear. There was a hand railing at the side, but she did not remember taking hold of it. While she and some of the witnesses who testified in her behalf found fault with the width of the tread of the steps, yet none of them had measured it, and none of them knew with any degree of accuracy what the width was. They merely guessed at it when they said six or seven inches. And over against these guesses was the clear and positive testimony of the contractor who built the steps, and of the assistant city engineer and the inspector of highways and several other witnesses who knew whereof they affirmed, and spoke from actual knowledge derived from measurements; and these men all said that the steps were broad, being twelve inches in the tread, with an overlap from the step above of not more than an inch. If this was true, the steps were admittedly all that could be desired in that respect. The width of the tread was important from the plaintiff's standpoint; for unless she could show that it was too narrow for safety, her case must fail. She brought nothing more than conjecture upon the part of her witnesses to sustain the point, and as against actual measurements these guesses did not amount to a scintilla of evidence. Where a matter of measurement is important, the 'guesses' or 'belief' of a witness cannot be accepted as against the sworn statements of competent witnesses who give the results of actual measurements. . . . Whatever may have been the occasion of plaintiff's fall, it does not appear to have been chargeable

to the plan upon which the steps were constructed and maintained by the city."

It is therefore manifest that the issues on behalf of appellee as to steepness and narrowness are not sustained, and the verdict, if sustained at all, must be referred to the issue of darkness. Of the thirteen witnesses for plaintiff who were introduced to substantiate the charge that the stairway was dark, ten of them testified only in a general way in this respect and solely as a matter of approximate judgment, and, of these, two admitted that the light was sufficient if the stairs were carefully used, and another of these thirteen witnesses admitted that the light was equal to that in the courthouse where the case was then being tried, in which connection it is noted that one of the witnesses for the defendant used the same expression by way of comparison. Three of plaintiff's witnesses did testify, however, in a more definite and dependable way in respect to this issue, as will be later mentioned, as against which we now note that these three, together with nine others of the thirteen witnesses for plaintiff, were equally positive that the stairs were steep and narrow, thus weakening the value of their testimony on all issues.

On behalf of defendant, twenty-two witnesses testified that the stairway was not dark even with the stairway lights turned out; seventeen of these witnesses testified that, with the stairway lights turned out, printed matter could be read on the stairway at the point where plaintiff fell; fourteen of these witnesses testified that they had actually tested this fact by actually reading print at the said point; four other witnesses who had not actually tested the issue by reading testified that they had tested it by the discovery that they could see the grain of the wood in the treads of the stairway and the heads of the nails therein, three of the latter witnesses being the carpenters and builders who had made the measurements hereinabove mentioned, and one of these was the city

building inspector. As against the foregoing array of specific testimony, only the three witnesses for plaintiff heretofore mentioned testified in a manner that may be considered as approaching that array in definiteness, and these three witnesses testified that while they had not attempted the reading test, it was impossible to read at the said point, and one of them was positive that the stairway was so dark that a paper could not be seen, much less to read its contents.

The quality of light or darkness is an issue which, of course, cannot be reduced to a mechanical exactitude by means of measurements taken under standard mechanical instrumentalities, and must at last be determined by means not so certain as that of actual measurement. Nevertheless, it is an issue capable of a high degree of demonstration by test or experiment such as was made in this case. We take it that it will not be disputed that, as a matter of law, if the employer has furnished a stairway upon which a person of normal vision may read print, or may see the grain in the wood and the nails in the treads, then such a stairway is a reasonably safe stairway so far as concerns the issue of light or darkness. And there could be brought to the witness stand no higher proof of this issue than that so large a number of persons, as in this case, have actually made a test or experiment and by actual, demonstrative experience have found themselves able to read and see the grain in the wood and the nail heads as aforementioned; it being noted in this connection that the testimony is undisputed that the stairway has remained in exactly the same condition as it was on the day of the injury, that the accident was on a clear and unclouded day near the noontime hour, and that the tests were made, not with more artificial lights, but with the stairway lights turned out.

It therefore .follows that, so far as it depends solely upon the evidence of the witnesses delivered on the witness stand, we would be obliged to say that the verdict,

although supported as aforesaid, is contrary to the overwhelming weight of the evidence. And this brings squarely into view the fact that the jury, on the motion of the defendant, was taken to the scene of the accident, and on a day which is not shown to have been different in the matter of sunlight from that of the day of the injury. The jury, when taken to this stairway, were required to view it from every angle, to go up and down it, and their attention was specifically called by counsel to every physical feature that was involved in the determination of the issues, and particularly in respect to the issue of light and darkness. In their presence the lights were turned out on the stairway, and again were turned on, and all these things were repeatedly called to their attention in every possible view of the case.

The courts of the several states have differed widely on the effect to be given by the appellate court to the view of the premises by the jury. Some courts hold that upon appeal the case must be considered solely upon the record of the testimony, while others maintain that the evidence which the jurors may reasonably be supposed to have obtained by the exercise of their powers of impartial observation while on the ground is to be considered as sufficient to sustain the verdict. Our court, while not having given any expression to a definite rule, has committed itself to a middle ground, as will be seen by reference to Bonelli v. Branciere, 127 Miss. 556, 90 So. 245; Cotton Mill Products Co. v. Oliver, 153 Miss. 362, 121 So. 111, and one or two others. The rule we think is summarized with approximate correctness in 1 Thomp. on Trials (2 Ed.), section 902, as follows: "The true solution of this difficulty is that cases where there has been a view stand on appeal on a special footing; that, although what the jurors have learned through the view is evidence to be considered by them, yet, on grounds of public policy, having reference to the known imperfections which attend the conclusions of jurors, and even

of the judges in the haste of nisi prius work, a reviewing court should set aside a verdict based partly on a view, unless it is supported by substantial testimony, delivered by sworn witnesses." See, also, City of Topeka v. Martineau, 42 Kan. 387, 22 P. 419, 5 L. R. A. 775.

The question therefore is reduced to this: Is the verdict on the issue of darkness of the stairway supported by substantial testimony delivered by sworn witnesses? Upon this question, although with apprehension that an injustice has been done, we must answer in the affirmative. It cannot be said that the testimony on this issue in behalf of appellee, and particularly as regards that of the three witnesses, twice hereinbefore referred to, is devoid of that quality which may be deemed substantial.

It is argued with much force of reason by appellant that the darkness of the stairway, conceding that there was not as much light thereon as claimed by appellant, was not the proximate cause of the accident; that the real cause was the fact that appellee had her arms loaded with towels so that she could not see her steps, even had the stairway been lighted with a brightness equal to open sunshine. We have carefully considered this question, and have come to the conclusion that this presents an inquiry typical of an issue that should be submitted to the practical determination of a jury taken from the ordinary walks of life, that there may be applied to its solution the knowledge of general experience and observation, and this by the attention to it of a number of different minds such as the twelve composing a jury.

Our conclusion, therefore, is that the judgment must be affirmed on the issue of liability, and this brings us to the assignment of error that the verdict on the issue of damages is not sustained and that it is grossly excessive. Appellee gave no very definite statement as to how she was injured. She says merely that she "fell sideways" and that her "hip and back hit the steps." She says that after the fall she went back upstairs and rested

awhile, after which she resumed her place at work, but, seeing that she could not continue, she again went up-stairs, and at the noon hour went to the street, took a bus, rode within one block of her home, walked the re-mainder of the distance, and went to bed; that a physi-cian, Dr. Reynolds, was called, who made only a casual examination, after which a chiropractor was called in, and from that time, December 21, 1927, down to the trial in April, 1929, she was treated only by chiro-practors. She says she was in bed about six weeks, and that during this time, as well as afterwards, the chiro-practors were treating her almost daily either at her home or when she would call at their offices. She spoke of her hip being set more than once by these chiroprac-tors, but admits that beyond what these practitioners told her she had no knowledge of this or of her injuries other than the pain. Her mother also spoke of her hip being several times set by chiropractors—she said a dozen times—but she also is not shown to have any de-pendable actual knowledge of this fact, if a fact, except that likewise obtained. It is also to be noted in this con-nection that, although plaintiff's declaration went into detail touching her injuries, no mention was made there-in of her hip being at any time out of joint. Neither of the chiropractors were introduced as witnesses, nor was either of the two X-ray pictures made by or for them shown in the evidence. Chiropractors are not physicians (see Hayden v. State, 81 Miss. 291, 33 So. 653, 95 Am. St. Rep. 471; Sec. 7452, Hem. 1927 Code; see, also, State v. Gallagher, 101 Ark. 593, 143 S. W. 98, 38 L. R. A. [N. S.] 328); and they are not therefore within the privilege of physicians under section 7455, Hemingway's 1927 Code. The case is not one of external injuries, where the court and jury could see them and know the extent thereof. It is solely of internal injuries, and presents a case where the information given the jury should be full, as well as dependable and cogent, out of all fairness to the court

as well as to the defendant, who is usually largely help-less and dependent in such cases.

Further and very significant testimony in respect to the injury was as follows:

Plaintiff said: "I am just as nervous as I can be, and lots of times, if I don't grip my hands it looks like I would just run off, or go through the chair or something like that. . . . Well, I get so nervous sometimes I just jump up and scream and just grip my hands and feel like I am going crazy sometimes. I have some kind of a crazy feeling in the back of my head that makes me feel like I am going crazy and have not got any sense right at that minute. I don't sleep very much." In answer to the direct question whether she suffered from hysterics as a result of her injury, she answered in the affirmative, and that she had frequent crying spells; that these spells often came to her, and that often at night she would wake up screaming at the top of her voice; that she had no control over her nerves; that she could embroider and read, but only for a short time, after which "I get so nervous it looks like I can't sit still and feel like I have got to go through the house somewhere."

The mother of appellee testified that she slept with her at night "because she is so nervous that she does not rest any and she just gets scared and does not seem like she knows what to do, and has some kind of a curious feeling she says she can't get over;" that she has similar spells two or three times a day and night; that she wakes up in the night saving she has seen something and cries some-times for three hours; that she has no control over these spells, and "it looks like she can't do anything with them, and can't sit still, and that she just has to jump up and down or something and that she does not know what she does want to do."

Dr. B. L. Robinson saw her for the first time during the trial in a room in the courthouse on a couch, and says: "I find her in a very nervous condition and her pulse is

considerably accelerated, her heart action, and she is in a highly nervous tension and seems to be suffering a great deal of pain, and she was crying and taking on about suffering with pain.'' He says that he examined her spine and her hip and the location of the nerves, and he would go over her body and would say, ''Is this sore here?'' and she would say ''Yes,'' and so on over different parts of the body. He stated that none of the bones in her back were broken, although the entire spine from the shoulders down seemed to be sore and gave pain on compression; that the coccyx, commonly called the tail bone, had been twisted or bent around. He did not say to what extent, and admitted that no part of the spinal column or major nerves passed through the coccyx. He said he could not find whether there were any broken parts about her hip, but stressed that the nerves in that region were irritated.

The only other physician introduced was Dr. E. E. Robinson, who also examined appellee at the courthouse, and had about two weeks before made an examination, but where, or under what conditions, or with what thoroughness, are not shown, and only in addition to being more specific in saying that the coccyx bone was about a quarter or half-inch out of line, his testimony was somewhat along the same lines of the other physician.

It will thus be seen that what is presented is, in all probability, a typical case of traumatic hysteria. This is a malady that all lawyers who have had extended experience in the prosecution or defense of personal injury cases have seen frequently enough to know and, to a considerable extent, understand, particularly those whose experiences have been both in the prosecution and in the defense of such cases and who have thus acquired their professional knowledge in a manner free from the bias of habitual interest. Every generally observed sympton is present in this case, and every symp-

tom that is said to be manifested according to the authorities on the subject. See 1 Wharton & Stille's Medical Jurisprudence, sections 804-817; 2 Witthaus & Becker Medical Jurisprudence, pp. 898-916. Yet these two physicians, called into the courthouse during the trial and at the very time and under the very circumstances when a case of traumatic hysteria would ordinarily be at the height of its outward manifestations, resorted to the very method of examination that would accentuate those symptoms and give them the appearance of physical injury unmixed with the hysteria, and thereupon solemnly proceeded forthwith to assure the jury that everything seen was due solely and directly to the injury, and that the condition was permanent, not only, but that appellee's life would be shortened and also suggested the very decided possibility that she would in the course of time go insane. They were asked numerous questions predicated on the assumption that appellee's hip was or had been out of joint, and also on the assumption that the spinal cord had been injured, although neither of them claimed to have found any such condition—and no other person of actual knowledge had so testified to the fact—and much if not most of their more serious forebodings of future disability and suffering were based on these assumptions; and one of these physicians, when confronted with the fact that the patient had walked upstairs and down again immediately after the injury, had walked part of the way home, and had been walking most of the time for more than a year, replied that this made no difference, the patient could walk nevertheless with her hip out of joint.

We do not share in the view frequently expressed by many courts to the effect that the opinions of medical experts are entitled to little credit or consideration (see quotations and citations 2 Moore on Facts, sections 1235-1246), but we do not agree that, unless all the four elements of skill, integrity, freedom from bias, and full op-

portunity of observation and examination under all conditions, are present in a case of complicated internal injury, such testimony is of little value and often may be worse than of no value, in that it may become dangerously misleading. A repeated examination and re-examination of the testimony of these two physicians, and particularly of the one first mentioned, when taken in connection with all the related testimony, and taking into consideration also those things which should have been noticed and covered in their answers, but which were avoided, has convinced us that the medical testimony in this case is undependable and will not support the large verdict returned in this case, and there is no testimony other than the medical testimony that, in such a case as this, will support it.

There is, however, a feature in the testimony of one of these physicians which is entitled to special consideration, because it not only has definite pertinency when taken in connection with the other testimony hereinabove mentioned, but has also the support of ordinary reason and common sense; and this is in regard to the method of treatment adopted in this case from the beginning of the injury down to the date of the trial. The reference is to the constantly repeated and daily renewed irritations of the involved areas by the severe methods said to be used by chiropractors. We mean no reflection on that worthy profession, for there are hundreds of cases where it is now the general opinion that their services are invaluable, and in some cases are admittedly superior to other methods of treatment; but we speak, as it is our duty to do, of this case and of similar cases of specific traumatisms. One of the physicians above mentioned testified directly, although with evident reluctance, that this treatment in such a case was calculated to do injury: and he made the distinct statement, as applied to this particular case, that by massage or manipulation, the more the nerves were irritated and aggravated, the more the liability of injury to the nervous system.

The pertinency of the above feature is apparent when it is considered that, according to the present record, it is the probability, especially when cautiously viewed, as is our duty in the premises, that this case is one of traumatic hysteria, and when we further take into view that, in such case, the victim is nearly always so thoroughly imbued with belief in the reality of that which is more largely a temporary mental attitude or conception, that the patient is able, and this from the very sincerity of the sufferer, often to deceive all of counsel in the case, almost always the jury, the members of which have had no opportunities for much knowledge along these lines, and as well, and more often than would seem possible, the physician is also deceived if his observation is only casual and extends over no sufficient period of time. We have already noted in this same connection the fact that the physicians were called to the courthouse, and, under the adverse conditions that necessarily appertained, there made the casual examinations upon which their testimony was finally based, but we must now also mention that several young ladies were also permitted to go to the room in the courthouse where the patient lay under the full influence of the hysteria, and thence, with the impressions of her sad condition thus emphasized, these witnesses were immediately put on the witness stand, and naturally conveyed to the jury these impressions, which, as one of them expressed, was that the patient was a physical and mental wreck.

On the contrary, when a patient suffering from traumatic hysteria is relieved from the extraneous distress of the present and the anxiety of the future, and is placed in quiet, cheerful, and encouraging surroundings, and is given that intelligent treatment which draws the mind and imagination away from thoughts of controversy and of misfortune and suffering, as well as from the realities thereof so far as possible, there is nearly always a recovery, and often a speedy recovery. Upon this whole

record, a resume of our conclusion is that it is the more probable that this is a case such as just stated; that the entire treatment and surroundings have been adverse to her recovery and were favorable to the development of the delusory symptoms upon which this verdict has in large part been based.

It is a statement of the rule generally found in the books that the damages recovered in any case must be shown with reasonable certainty both as to their nature and in respect to the cause from which they proceed. In a case like this, that general statement is qualified by the additional statement that the consequential damage and the extent thereof must be established as a reasonably certain probability. There is another vital rule: "The object of a judicial trial is to enable the State to establish and enforce justice between party and party," and "when a party appeals to the sovereign for justice he impliedly consents to the doing of justice to the other party, and impliedly agrees in advance to make any disclosure which is necessary to be made in order that justice may be done"—the latter, of course, not including any privileged matter. 1 Thomp. on Trials (2 Ed.), section 859.

We are of opinion that the course of this trial was such that appellee did not, in respect to the issue of damages, sufficiently bring herself within the several requirements stated in the foregoing paragraph. It is our duty, therefore, to declare that the verdict in this case is excessive. Moreover, its lack of dependable support is such that we can find nothing within the record upon which satisfactorily, at any particular amount, to base an order for a remittitur; hence the verdict and judgment as to the damages is reversed, and a new trial is ordered upon the sole issue of the amount of damages and in order that this issue may be more fully and fairly examined and developed.

Affirmed in part, and in part reversed and remanded.