## MOBILE & O. R. CO. *v.* BRYANT.

(Division B. Feb. 23, 1931.)

[132 So. 539. No. 29020.]

Carl Fox, of St. Louis, Mo., and Baskin, Wilbourn & Miller, of Meridian, for appellant.

Reily & Parker, of Meridian, for appellee.

Argued orally by J. C. Wilbourn and R. E. Wilbourn, for appellant, and by Marion W. Reily, for appellee.

Griffith, J., delivered the opinion of the court.

On the 27th day of September, 1929, the wife of appellee was driving south in an automobile and along a road or street in the unincorporated village of Lauderdale, which said street runs parallel with, and on the east side of, the railroad track of appellant at a distance generally of slightly less than fifty feet. When the said wife reached a point one thousand fifty-five feet south of the depot, she turned to her right and with little, if any, slackening of speed, she suddenly drove upon the railroad track at a village dirt road crossing, and was there struck and killed by appellant's north-bound mail, express, and passenger train. The train at the time was running at the rate, usual at that point, of about twenty-five miles an hour and was exactly on time according to a schedule that had been used by this particular train for three years. The locomotive was a combination gas and electric machine and was equipped with an air whistle and a forty-pound automatic bell, and was being operated by an engineer of long and competent experience. The whistle had been sounded for the station and for all crossings, and according to the overwhelming weight of the evidence the bell was and had been continuously ringing for the distance required by statute of steam locomotives. The day was clear, and the accident happened at 9:04 A. M. The unfortunate lady had lived for some time in the said village, was accus-

tomed to drive about in the immediate community, and, it must be assumed, was acquainted with the long-established schedule aforesaid.

The rate of speed at which decedent was driving when she turned into the crossing, and the rate at which she was traveling when struck, is, as usual, not agreed upon by the witnesses. Only four witnesses would undertake an estimate on this subject, and only one of these for appellee. This witness said: "She was driving between five and six and seven miles an hour, something like that." This witness was at some distance, however, up in the business portion of the village, and his observation of the matter was so poor that he admitted he could not tell whether decedent stopped before going upon the track, whereas all the other witnesses for both sides agree that she did not, and this witness says, too, that he did not hear the bell ring, although the fact that the bell was ringing is established by practically every other observant witness. A witness for appellant, who was also, at the time, up in the business portion of the village near the location of the first witness above mentioned, gave it as his estimate that deceased was traveling at the rate of twenty-five miles an hour at the time she was hit. The other two witnesses, however, were near the crossing, one about one hundred feet therefrom, who said she was going about ten to fifteen miles per hour, and the other about ninety feet away, who said her rate of speed was about fifteen or twenty miles an hour. Let us say, then, giving every possible indulgence in favor of appellee in view of the verdict, that her rate of speed was between eight and nine miles per hour—which would be about twelve feet per second.

The maps and photographs, together with the testimony in respect to actual measurements, show that the

distance from the center of the road where the curve begins for the crossing, to the main line track is forty-three feet. The road is approximately twenty feet wide. Deceased was driving on the right-hand side of the road nearest the track. This placed her, therefore, when she began to negotiate the turn, within less than forty feet of the track on which she was hit. Consequently, only three seconds elapsed from the time she turned westward into the crossing until she arrived on the main line track and was struck.

It would require some moment of time after the driver of the automobile had begun the turn into the crossing for the impression or conclusion or realization to register upon the mind of the locomotive engineer that the said driver did not intend to stop; it would require a second for the engineer to get hold of and turn the brake valve, and another second to triple, and for the brakes to take hold, in response to the said valve, the said latter propositions being undisputed in the evidence, and then, as a matter of common sense, certainly another second would intervene before any appreciable response in the reduction of speed of a train running twenty-five miles an hour would result. Thus the three seconds of time that were available here would have elapsed without any reasonable possibility, to say nothing of probability that within his hopelessly short time anything effectual could have been done by the engineer to avoid the collision. Three seconds are only one breath in the respiration of a normal person. Let us look at the second hand on a watch and consider how futile that space is for the effectual checking of a railroad train. It is not disputed that after the engineer discovered the danger, that is to say, as soon as the deceased had definitely started upon the crossing, the engineer then did all in his power to avert the injury, and it is shown by those on the train that the emergency brakes were felt, that is, the effect

thereof, before the train reached the crossing, but just where in point of the actual number of feet of course, no witness could well have truthfully said, except to say as they did that it was just before the crossing was reached or just about that time.

This, therefore, brings us upon the two grounds mainly relied on by appellee to sustain the judgment. These may be fairly reduced to, or grouped under, the following contentions: (1) That the employees of appellant saw or should have seen the driver of the automobile as she was traveling southward parallel with the railroad track and should have anticipated that she would turn upon the track at the said crossing without stopping or slackening speed; and (2) that the crossing was in a thickly populated settlement, was much used, wherefore in approaching the said crossing, appellant should have anticipated the presence of a traveler or travelers there, and should as to the speed of the train have kept it so fully under control as to be able safely to check or stop the train before striking a person coming upon said crossing.

The first contention has been ruled upon adversely to appellee in Mobile & O. R. Co. v. Johnson, 157 Miss. pages 266, 276, 126 So. 827, 830, in which it was said: "It is to be observed also that these instructions are capable of the construction that it was the duty to maintain a lookout beyond the right of way and to anticipate that a person traveling in proximity thereto would, without taking any precaution in his own behalf, drive suddenly upon the track. A large part of the railroad mileage in this state is skirted on one side or the other by highways with numerous crossings, leading therefrom. It is enough to say, without more, that, if this character of lookout were required, there would be, in order to avoid possible liability, an intolerable recurrence of the throwing on of emergency brakes and an inadmissible inter-

ference with the efficient movement of the commerce of the country."

Upon the second proposition we would call attention to the recent case of Hancock v. Illinois C. R. Co. (Miss.), 131 So. 83, 84, in which it was said: "The very purpose of locomotion by steam upon railways is the accomplishment of a high rate of speed in the movement of passengers and freight, and this the law authorizes. To require railroads generally so to reduce their speed at all grade crossings as to avoid collisions with persons who may, carelessly or accidentally, be upon the crossing when a train is approaching would defeat, to a great extent, the purpose of the existence of railroads." And the court went on to say that when the required warnings have been given of the approach of the train, and the statutory stop sign was situated at the crossing—both of which are shown in this case—"a traveler on a highway should not, and ordinarily has no legal right to, ask for more." In the Hancock case the court, however, expressly pretermitted the question as regards crossings much traveled or crowded.

In the present case, upon the issue last mentioned, one witness only was directly interrogated, and in response to the question whether there was much or little traffic at that crossing, he answered: "A good deal, more or less, every day." The answer involves an admixture of opinion and fact, and besides is qualified in such a way as to convey little if any substantial meaning. However, there are five photographs, taken on the day of the accident—the said photographs being manifestly excellent and perfect in clear reproduction, even to the slightest detail, and look upon the said crossing from every angle or view point—which disclose beyond any doubt that this crossing is not within the class to be termed much used, frequently used, or crowded, as the law understands those terms in the connection here involved. These

photographs disclose the facts to us by way of demonstration, and we apply the law to the facts thus demonstrated—any verdict to the contrary notwithstanding.

It will be observed that in the Hancock case, supra, the court said that there might be cases where it would be negligence for a railroad train to approach a crossing at a high rate of speed if the physical or atmospheric conditions were such as to interfere with the efficacy of the usual warnings. Under this principle, the further contention is made herein by appellee that a sawmill situated two hundred feet south of the crossing and the noise made by this mill created a physical condition interfering with the efficacy of the customary warnings, and that, therefore, more was required in this particular case, namely, that the train must have been brought to a much lower rate of speed than that at which it was running when it reached this crossing. In applying the said principle, we are disposed to maintain it in that manner whereby the facts shall actually and substantially be such as to bring the case, not dubiously, but well within it; else as a practical matter, and except in the open country, we would soon have the issue whether railroads in the interest and service of the general public are to have the right of way on their tracks or whether the individuals of the public, riding in increasing thousands of automobiles, shall, at crossings, have the first right.

The photographs aforementioned show the said sawmill to have been comparatively small, and the testimony discloses without any serious dispute that, except as to the workers therein, the noise of the mill made no substantial interference with the customary warning signals given by the whistle, and the bell of the train—and as already said these were duly sounded.

The facts of this case, when examined with impartial reason, under the law, are not sufficient to sustain a verdict against the appellant. The judgment is therefore reversed, and the case dismissed.

Reversed and dismissed.