CARLSON, Presiding Justice,
for the Court:
¶ 1. Michael Travis died on May 16, 1997, when a train struck his vehicle at a railroad crossing. His mother, Mary Travis, filed a wrongful-death suit against Illinois Central Railroad Company and its employees (collectively “Illinois Central”) in the Holmes County Circuit Court. Trial was held in October 2009, and the jury assessed damages in the amount of $6.5 million. Based on the jury’s allocation of fault, the trial court entered a judgment in favor of Travis in the amount of $4,875,000. Illinois Central filed this appeal. We reverse and render, finding that the trial court erred in denying Illinois Central’s motion for judgment notwithstanding the verdict, because the evidence does not support the jury’s verdict.
FACTS
¶ 2. Around 10:00 a.m. on May 16, 1997, a southbound Illinois Central freight train struck a pickup truck driven by Michael Travis at a railroad crossing in the Mile-ston community of Holmes County, Mississippi. Approximately fifteen trains came through the Mileston crossing each day. The train at issue consisted of two locomotives and 117 cars. Four large headlights on the front of the lead locomotive were on at the time of the accident. The train was traveling at approximately fifty-two miles per hour prior to the accident; the speed limit was sixty miles per hour. The train was operated by Arthur Irby, the engineer, and A.C. Isaac, the conductor.
¶ 3. The decedent was familiar with the Mileston railroad crossing and had traversed it multiple times each week, while calling on farmers in the community to whom he provided loan assistance. On the *324 morning of the accident, Michael had driven through that particular crossing on his way to meet with R.C. Howard. Returning from Howard’s home, Michael approached the Mileston crossing again. As he approached, a large tractor with affixed farm implements was crossing the railroad tracks, and Michael backed away to give the tractor room to pass. At this time, the Illinois Central train was proceeding south through a curve just north of the Mileston crossing.
¶ 4. Isaac testified that, as the train came out of the curve, he saw the tractor approaching the crossing from the highway side of the tracks — traveling from west to east. As soon as they saw the tractor, Irby began sounding the horn. Isaac and Irby testified that the tractor safely reached the other side of the tracks, and there seemed to be no need to reduce the speed of the train. In fact, at fifty-two miles per hour, the train already was traveling below the sixty-miles-per-hour speed limit.
¶ 5. Isaac had seen Michael’s truck back away from the crossing to let the tractor pass, and he testified that there was no indication that Michael was going to proceed onto the tracks or attempt to cross in front of the oncoming train. Irby saw Michael’s truck once the tractor cleared the tracks, and he also believed the truck would stop. However, after the tractor cleared, Michael slowly approached the crossing and came to stop directly beside the tracks. His tires did not cross the tracks, but his truck was close enough to be clipped by the train. Michael died shortly after the accident. Additional facts will be discussed as needed.
PROCEDURAL HISTORY
¶ 6. Michael’s mother, Mary Travis, filed a wrongful-death suit against Illinois Central and Arthur Irby in the Circuit Court of Holmes County. Travis alleged that locomotive engineer Irby was negligent because he failed to timely and properly apply the brakes and failed to keep a proper and reasonable lookout. Against Illinois Central, Travis alleged failure to properly train the crew; failure to adopt and enforce adequate policies and procedures relating to train operation; and failure to warn of the dangerous condition at the crossing where the accident occurred, when Illinois Central knew or should have known that the crossing was unreasonably dangerous.
¶ 7. Initially, the case was removed to the United States District Court for the Southern District of Mississippi, where Irby was dismissed from the suit, and summary judgment was granted in favor of Illinois Central on all issues. Travis appealed to the Fifth Circuit Court of Appeals. The Fifth Circuit vacated the district court’s order, finding that the district court did not have diversity jurisdiction. Travis v. Irby, 326 F.3d 644, 651 (5th Cir.2003). The case was remanded to the Holmes County Circuit Court. Id.
¶ 8. The first trial commenced on September 9, 2003, and culminated six days later with the jury awarding Travis $5 million in damages. The jury attributed twenty-five percent of the negligence to Michael and seventy-five percent to Illinois Central. Based on the jury’s apportionment of fault, the trial court entered a judgment against Illinois Central in the amount of $3,750,000. Illinois Central appealed the verdict, and this Court reversed and remanded for a new trial. Irby v. Travis, 935 So.2d 884, 898 (Miss.2006).
¶ 9. The second trial commenced on October 5, 2009. The jury returned its verdict on October 8, 2009, and found that Michael and Irby each were twenty-five percent at fault and Illinois Central was fifty percent at fault. The jury assessed a *325 total of $6.5 million in damages; based on the allocation of fault, the trial court entered a judgment in favor of Travis in the amount of $4,875,000. Illinois Central filed several post-trial motions, including a motion for a judgment notwithstanding the verdict (JNOV) and, alternatively, for a new trial and/or remittitur. Following the trial court’s denial of these motions, Illinois Central filed this appeal.
DISCUSSION
¶ 10. Illinois Central presents the following issues on appeal: (1) the trial court erred in denying Illinois Central’s motion for JNOV because there was no factual or legal basis to support the jury’s verdict; (2) the trial court erred in denying Illinois Central’s objections to portions of the train crew’s depositions regarding the training they received from Illinois Central; (8) the trial court erred in denying Illinois Central’s Daubert[1] motions to exclude the expert testimony of Dr. David Lipscomb, Jim Scott, and Dr. Bernard Abrams; (4) the trial court erred in denying Illinois Central’s objections to Travis’s jury instructions and in giving instructions P-3, P-6, P-7, P-8, P-11, and P-16 to the jury; (5) the trial court erred by denying and/or modifying Illinois Central’s proposed jury instructions D-l, D-2, D-3, D-6, D-7, D-8, and D-10; (6) the trial court erred in denying Illinois Central’s motion for mistrial; (7) the trial court erred in denying Illinois Central’s motion for change of venue; (8) the trial court erred in denying Illinois Central’s objections to Travis’s deposition designations; (9) the jury’s verdict was against the overwhelming weight of the evidence; and (10) the amount of the jury’s verdict was against the overwhelming weight of the evidence.
¶ 11. The first issue — whether the trial court erred in denying Illinois Central’s motion for JNOV — is dispositive, therefore, we will address that issue only. This Court applies a de novo standard of review when considering a trial court’s denial of a motion for JNOV. Wilson v. Gen. Motors Acceptance Corp., 883 So.2d 56, 64 (Miss.2004). We have explained the standard as follows:
[T]his Court will consider the evidence in the light most favorable to the appel-lee, giving that party the benefit of all favorable inference[s] that may be reasonably drawn from the evidence. If the facts so considered point so overwhelmingly in favor of the appellant that reasonable [jurors] could not have arrived at a contrary verdict, we are required to reverse and render. On the other hand if there is substantial evidence in support of the verdict, that is, evidence of such quality and weight that reasonable and fair minded jurors in the exercise of impartial judgment might have reached different conclusions, affir-mance is required.
Ill. Cent R.R. Co. v. Hawkins, 830 So.2d 1162, 1169 (Miss.2002) (quoting Steele v. Inn of Vicksburg, Inc., 697 So.2d 373, 376 (Miss.1997)).
¶ 12. Illinois Central claims that there is no credible evidence to support the jury’s verdict, and that the evidence overwhelmingly points in favor of Illinois Central such that no reasonable jury could have found for Travis. Thus, Illinois Central claims that the trial court erred in denying its motion for JNOV and that this Court should reverse and render. Understandably, Travis maintains that the evidence supports the jury verdict. Travis *326 also claims that the “law-of-the-case” doctrine applies and that this Court need not readdress this issue.
¶ 13. According to the law-of-the-case doctrine, “[wjhatever is once established as the controlling legal rule of decision, between the same parties in the same case, continues to be the law of the case, so long as there is a similarity of facts.” Dedeaux Util. Co., Inc. v. City of Gulfport, 63 So.3d 514, 539 (Miss.2011) (quoting Moeller v. Am. Guar. & Liab. Ins. Co., 812 So.2d 953, 960 (Miss.2002) (citation omitted)). But, “if the facts are different, so that the principles of law announced on the first appeal are not applicable, as where there are material changes in the evidence, pleadings, or findings, a prior decision is not conclusive upon questions presented on the subsequent appeal.” Fortune v. Lee County Bd. of Supervisors, 725 So.2d 747, 751 (Miss.1998) (quoting Conti Turpentine & Rosin Co. v. Gulf Naval Stores Co., 244 Miss. 465, 142 So.2d 200, 207 (1962)).
¶ 14. In the first direct appeal, on the issue of whether the trial court erred in failing to grant Illinois Central’s motion for JNOV, this Court held:
[Bjased on conflicting testimony as to the existing vegetation at the Mileston crossing on the date of the accident, and the actions of Michael and the crew members on the train, we are constrained to find, as a matter of well-established law, that there exists in the record evidence of such quality and weight that reasonable and fair-minded jurors, in the exercise of impartial judgment, might have reached different conclusions as to the appropriate verdict. [Poole ex rel. Poole v. Avara, 908 So.2d 716, 726 (Miss.2005).] Thus, we are unable to find that the trial court committed error in denying Illinois Central’s motion for a judgment notwithstanding the verdict; therefore this issue is without merit.
Irby, 935 So.2d at 890. We find that the law-of-the-case doctrine does not apply in today’s case. After this Court remanded the case, a new trial was held, and evidence was presented, admitted, and excluded consistent with this Court’s opinion.[2] “A new trial provides a clean slate. The issues must be retried, and the parties may thus present evidence differently.” Dedeaux, 63 So.3d at 539 (quoting White v. Stewman, 932 So.2d 27, 33 (Miss.2006)). This Court’s ruling regarding the evidence presented at the first trial is not binding as to what this Court can conclude regarding the evidence presented in the second trial, as only the evidence presented at the second trial will be considered on appeal.
¶ 15. Further, this Court has recognized exceptions to the law-of-the-case doctrine, including “material changes in evidence, pleadings[,j or findings ... or the need for the Court to depart from its earlier decision after mature consideration so that unjust results will not occur.” Moeller, 812 So.2d at 960 (internal citations omitted). After reviewing the evidence presented at the second trial, it is clear that the evidence did not support the verdict, and the trial court should have granted Illinois Central’s motion for JNOV. Any other result would be unjust. Therefore, we find that the law-of-the-case doctrine does not bar consideration of this issue on appeal.
*327 ¶ 16. Illinois Central avers that no evi-dentiary basis exists to support Travis’s causes of action for negligence. Specifically, Illinois Central claims that there was no legal or factual basis to support Travis’s allegations regarding the crew’s failure to activate the locomotive horn properly, failure to activate the locomotive bell, failure to keep a proper lookout, or failure to activate brakes; nor was there a basis for Travis’s allegations regarding the cross-buck, the “extra-hazardous” nature of the crossing, or other conditions of the crossing. Each of these points will be addressed in turn.
A. Whether there was a factual and/or legal basis to support Travis’s allegations regarding the horn activation.
¶ 17. Illinois Central contends that the locomotive horn was sounded in accordance with Mississippi law and was audible to motorists; thus, no reasonable juror could have imposed liability on Illinois Central or its employee based on a failure to activate the horn adequately. To the contrary, Travis maintains that the issue was not whether the horn was sounded; it was undisputed that the horn was, in fact, sounded. Rather, Travis claims that the issue was whether the horn was sounded in repeated intervals in compliance with Mississippi law and Illinois Central’s own regulations. Mississippi law provides:
Every railroad company shall cause each locomotive engine run by it to be provided with a bell of at least thirty (30) pounds weight and with a whistle or horn which can be heard distinctly at a distance of three hundred (800) yards, and shall cause the bell to be rung or the whistle or horn to be blown at the distance of at least three hundred (300) yards from the place where the railroad crosses over any public highway or municipal street. The bell shall be kept ringing continuously or the whistle or horn shall be kept blowing at repeated intervals until said crossing is passed.
Miss.Code Ann. § 77-9-225 (Rev.2009).[3] Illinois Central’s Operating Rule 14(Z) requires the horn to be blown in a repeated pattern of two longs, one short, and one long when approaching a crossing. The crew should start sounding the horn no later than the whistle sign, and the signal should “be prolonged or repeated until the crossing is occupied.” Irby and Isaac both testified that they had been instructed to blow the horn two longs, one short, and one long when approaching a public crossing.[4]
¶ 18. Irby and Isaac testified that, as soon as they saw the tractor when they came out of the curve, they started sounding the horn. Isaac testified that, when the train came out of the curve, Irby started blowing the horn in the “normal whistle signal” — two longs, one short, and one long — although Isaac could not remember if Irby was able to finish the pattern. Irby testified that, as a natural reflex, he would have started blowing the horn in the correct pattern. He did not think that he “just pulled down” on the horn in one continuous blow.
¶ 19. Eyewitness Thelma Washington testified that she heard the horn blowing “nonstop” from around the curve all the *328 way to the Mileston crossing. Travis’s expert, Jimmy Scott, testified that the locomotive event recorder data revealed that the horn was blown for fourteen seconds and for a distance of more than 1,000 feet before reaching the crossing, which is in excess of what is required under Section 77-9-225. Illinois Central’s expert, Dr. Robert MacRae, also testified that the horn was blown for at least fourteen seconds prior to the accident. Dr. MacRae testified that, even though the data indicated that the horn was blown continuously, there could have been breaks that did not register.
¶ 20. Travis claimed that the crew was required to blow the horn in a particular pattern, rather than continuously, and that failure to do so was negligent and contributed to the accident. However, Section 77-9-225 requires the horn to be blown “at repeated intervals,” not in a particular pattern. “At repeated intervals” means there should be breaks in the sounding of the horn, but the length of the breaks or time between the breaks is not specified. Mac-Rae testified that at other times on the trip, the horn was blown at intervals over periods of thirty to sixty seconds. In this instance, the crew had only fourteen seconds from the time they saw the tractor (which was before the whistle sign) until the train reached the crossing. Scott testified that to employ the long-long-short-long pattern, each horn blow should last five to seven seconds, with the breaks between each blow lasting one to two seconds. If the crew had applied this pattern, it is likely that they would have had time for one long, one break, and one long before reaching the crossing. One break of one to two seconds between two long blows is not very different from one continuous blow. Further, the evidence is not conclusive that the normal pattern was not at least started prior to the whistle stop, as both Isaac and Irby testified that they employed the appropriate pattern.
¶ 21. Travis’s expert, audiologist Dr. David Lipscomb, testified that breaks in sounding the horn are “attention grabbing” and “more effective” than a continuous sound. He opined that, in the absence of an interrupted horn, Michael would have heard the horn about one second before impact. Dr. Lipscomb testified that he did an analysis “with various sound measures, comparing the different factors” to reach that conclusion, some of which was explained before the jury. Notably, Dr. Lipscomb never recreated the exact circumstances existing at the time of the accident when performing his tests— among other things, the tests were not performed at the scene of the accident, the same model truck was not used, and the sound of the tractor moving on gravel was not included. For one test, Dr. Lipscomb used a car horn instead of a train horn. Further, Dr. Lipscomb’s opinion was based on the “alerting level” of the train horn, being the optimal level at which the horn would have “alerted” Michael, not the level at which the horn would have audible or detectable to him.[5]
¶ 22. In spite of Dr. Lipscomb’s opinion, eyewitnesses testified that they heard the horn blowing from around the curve all the way to the crossing, which was more than one second before the accident. The evidence is clear that the horn was blown for at least fourteen seconds and for more than 1,000 feet before the train reached the crossing. Section 77-9-225 requires the horn to be sounded from the whistle sign through the crossing, for at least 900 feet. Miss.Code Ann. § 77-9-225 (Rev. 2009). The crew complied with this re *329 quirement. We recognize the possibility that the crew may not have sounded the horn in repeated intervals, as required by Section 77-9-225. But, that section does not specify the types or lengths of the intervals, and no federal or state law in effect at the time of the accident required the horn to be sounded in any particular pattern. The pattern to be used was specified in Illinois Central’s operating procedures, but failure to comply with a company’s internal operating procedures is not a violation of the law.
¶ 23. Again, Irby testified that he began to blow the horn in the normal whistle pattern as required. If the crew members had been able to see the tractor earlier, they undoubtedly would have sounded the horn for a longer period of time, as indicated by the sounding of the horn in intervals over longer periods of time at other times throughout the trip. Further, there is no evidence that the horn was not audible, as eyewitnesses testified that they heard the horn the entire time it was blowing. There is no evidence to support the allegation that Michael may not have heard the horn simply because it may have been blown continuously rather than in intervals. We would not reverse on this issue alone; but, considered in conjunction with all of the evidence presented, the jury’s verdict is not supported by the evidence.
B. Whether there was an evidentiary basis to support Travis’s allegation of failure to activate the locomotive bell.
¶ 24. Illinois Central avers that the testimony at trial regarding its failure to ring the locomotive bell was “inflammatory and unfairly prejudicial,” because Section 77-9-225 does not require both the horn and the bell to be sounded. See Miss.Code Ann. § 77-9-225 (Rev.2009). Travis maintains that continuous sounding of the locomotive bell would have mitigated the negligence of failing to sound the horn in repeated intervals. Thus, Travis claims that evidence pertaining to Illinois Central’s failure to sound the bell was admitted to show that Illinois Central had failed either to sound the horn in repeated intervals or to ring the bell continuously as required by Section 77-9-225.
¶ 25. Section 77-9-225 requires the locomotive engineer to either sound the horn or the locomotive bell for 300 yards in advance of a crossing; it does not require both. Wilson v. Kan. City S. Ry. Co., 276 F.Supp.2d 614, 617 (S.D.Miss.2003) (citing Miss.Code Ann. § 77-9-225 (1999)). As set forth in the previous section, the evidence was uncontradicted that the horn was sounded for more than 900 feet as required by law. We recognize that the horn may not have been sounded in intervals, but, as discussed above, we do not find that to be conclusive proof of negligence, because eyewitnesses testified that the horn was audible as soon as the train came out of the curve. Irby testified that the horn was the loudest warning device on the train. Travis’s expert also testified that the horn would have been much louder than the bell. Therefore, use of the bell would not have served any purpose and would not have alerted anyone of the oncoming train.
¶ 26. Because the bell would not have been heard over the horn, and the statute does not require use of both, evidence and testimony regarding use of the bell was irrelevant and should have been excluded. Travis’s allegation regarding the train crew’s failure to ring the locomotive bell is without merit.
C. Whether there was an evidentiary basis to support Travis’s allegation that the train crew failed to keep a proper lookout.
¶ 27. Train crews have a duty to keep a proper lookout when approaching a *330 crossing. Hines v. Moore, 124 Miss. 500, 87 So. 1, 3 (1921). However, this Court consistently has held that train crews have a right to assume that drivers will obey traffic signals and will look and listen for the train. See Wilner v. Miss. Export R.R. Co., 546 So.2d 678, 681-82 (Miss.1989); Mobile & O.R. Co. v. Johnson, 165 Miss. 397, 141 So. 581, 581 (1932). Isaac and Irby saw the tractor as soon as it was physically possible, when the train came out of the curve. Isaac saw Michael’s truck back up to let the tractor pass, and he watched the truck after the tractor had cleared the tracks. Irby testified that he looked straight ahead at the crossing from the time he saw the tractor. As soon as the tractor cleared, he noticed Michael’s truck approaching at a slow rate of speed and assumed it would stop. Irby watched the truck until his view was blocked by part of the train, at which point the truck was still moving slowly, and it was “a safe distance from the track” behind the cross-buck sign, so Irby had no reason to think the truck would not stop.
¶ 28. Illinois Central argues that uncon-tradicted testimony established that the train crew kept a proper lookout. We agree. Any speculative testimony to the contrary should have been excluded, and the jury should have been instructed not to consider any allegations that the crew was not keeping a proper lookout.[6] Travis’s allegation that the train crew was not keeping a proper lookout is without merit.
D. Whether there was a basis to support Travis’s allegations concerning failure to apply the brake.
¶ 29. Illinois Central argues that the crew had no duty to stop the train until it became evident that Michael intended to proceed onto the crossing in disregard for his own safety. Moreover, it contends that, as a matter of law, the crew was entitled to assume that Michael would stop his vehicle or at least slow sufficiently to see if a train was approaching. According to Travis, Illinois Central Operating Rule B and Operating Rule 34 required the crew to take immediate action if anything on the tracks created any doubt or uncertainty.
¶ 30. Operating Rule 34 requires employees to maintain a constant lookout and addresses where crew members are to be positioned on the train; that rule does not apply to braking. Operating Rule B provides, in part, “If there is doubt or uncertainty when immediate action is necessary, the safe course must be taken.” Again, failure to comply with a company’s internal operating procedures is not a violation of the law. However, that is not to say that the train crew violated the operating procedure. Irby and Isaac both testified that they had no reason to think the truck would not stop; there was no “doubt or uncertainty” that would have required them to take immediate action.
¶ 31. According to Mississippi law, train crews have a right to assume that a vehicle will heed warning signals and the visual approach of a train and that the driver will stop. Gulf, Mobile & Ohio R.R. Co. v. Grubbs, 260 So.2d 837, 839 (Miss.1972). The crew is entitled to presume that a driver will slow or stop prior to reaching the tracks to see if a train is approaching. The crew is not required to anticipate that the driver will not look and listen for the train. Johnson, 141 So. at 581. Train crews do not have a duty to stop or slow the train until it becomes apparent that a driver will not stop. Maxwell v. Ill. Cent. Gulf R.R., 513 So.2d 901, 905 (Miss.1987) (“the speed of the train need not be slackened until circumstances *331 show that the person will probably not seek safety in time”).[7]
¶ 32. In the instant case, once the tractor cleared the tracks, the crew had no indication that the truck would proceed onto the tracks or attempt to cross in front of the oncoming train. Michael slowly approached the crossing after the tractor passed, and Irby and Isaac took his slow approach as an indication that he saw the train and would come to a complete stop before reaching the tracks. Therefore, the crew had no reason to employ the brakes. Dr. MacRae agreed that, when the crew lost sight of Michael’s truck, it was still east of the crossbuck sign, so they had no reason to apply the brakes.
¶ 33. Further, the evidence is clear that, from the time the crew saw the tractor, no application of the locomotive’s brakes would have prevented the accident. Irby testified that he had his hand on the automatic brake valve, but that using the brake or reducing the throttle at that point “would not [have] changed the speed of th[e] train in that short [of] a distance.” Dr. MacRae testified that, even if the emergency brakes had been applied at the whistle sign, which was 960 feet from the crossing, the train would have reached the crossing only one half second later than if the brakes had not been applied,[8] which certainly would not have prevented, or even lessened, the accident. When the brakes were applied immediately after the collision, the train traveled approximately 2,480 feet before coming to a stop. Therefore, from the time the train came out of the curve and Irby and Isaac saw the tractor, even if the crew had attempted to brake for the tractor, rather than for Michael’s truck, the train would have gone more than 1,400 feet past the crossing. *332 Travis provided no evidence to dispute this fact.
¶ 34. Finally, the fact that the train would not have been able to stop has nothing to do with the train’s speed. The train was traveling at fifty-two miles per hour in a sixty miles-per-hour zone. Illinois Central maintains that any claim that the train was traveling too fast or that it could have slackened the train’s speed is preempted by federal law. Illinois Central is correct that a state tort claim based on allegedly excessive speed is preempted by federal law when a train was traveling below the maximum allowed speed set by the Federal Railroad Administration. Hesling v. CSX Transp., Inc., 396 F.3d 632, 637-38 (5th Cir.2005) (discussing CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 675-76, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993), in which the United States Supreme Court held that the Federal Railroad Safety Act expressly preempted the plaintiffs state tort claims based on excessive train speed where the train was traveling below the maximum allowable speed).
¶ 35. The jury was instructed properly that the train was traveling below the legal maximum speed, and that it should “not consider in any manner whatsoever whether the train should have been traveling at a lower rate of speed or whether the train crew was negligent in failing to operate the train at lower speed.”[9] The jury was instructed that a train is not required to slow down when approaching a crossing, and that train crews have a right to assume that approaching vehicles will observe traffic signs and yield to approaching trains until it becomes apparent to the crew that the vehicle will not stop. However, the jury was not instructed specifically that, in this case, the crew acted properly and did not have a duty to apply the brakes. Because the crew had no reason to employ the brakes, and because doing so even at the first possible opportunity would not have prevented the accident, Travis’s allegation of failure to apply the brakes is without merit.
E. Whether there was a basis to support Travis’s allegations regarding the crossbuck sign at the Mileston crossing.
¶ 36. Travis claimed that the crossbuck sign failed to comply with Mississippi law and the Manual on Uniform Traffic Control Devices (“MUTCD”). Travis alleged that the crossbuck sign was “improperly positioned and thus failed to properly instruct” Michael as to where to stop his vehicle. Illinois Central conceded that the crossbuck sign was not new but maintained that it was visible to the naked eye and provided adequate warning to motorists. Further, Michael had traveled over the crossing multiple times per week, including once earlier the same day, and he was aware of the crossing.[10]
*333 ¶ 37. The requirements for cross-buck signs are found at Mississippi Code Section 77-9-247, which provides:
Every railroad corporation or company or person or persons operating or controlling any railroad track intersecting a public road or street at grade crossings shall erect and maintain at each such crossing the standard sign known as “railroad crossbuck,” the design of which has been standardized by the Association of American Railroads and which appears in the “Manual on Uniform Traffic Control Devices” for the State of Mississippi....
Provided, further, that said railroad crossbuck shall be reflectorized and be placed in the right side of the road or street on both sides of the railroad and shall indicate the number of tracks crossing the road or street in accordance with the aforesaid manual on uniform traffic control devices.
Miss.Code Ann. § 77-9-247 (Rev.2009). In addition to the requirements set forth in Section 77-9-247, Travis claims that the MUTCD requires the crossbuck sign to be a minimum of twelve feet from the nearest rail in rural areas. And Travis alleges that the crossbuck sign at the crossing at issue was less than twelve feet from the rail. Travis provided no citation to authority for this requirement, nor is there any proof that the crossbuck sign was less than twelve feet from the rail, assuming that is the requirement.[11]
¶ 38. Although Travis did not cite any rule, this Court found the following standards pertaining to the positioning of crossbucks in the MUTCD:
Standard:
03 As a minimum, one Crossbuck sign shall be used on each highway approach to every highway-rail grade crossing, alone or in combination with other traffic control devices.

Guidance:

08 Crossbuck signs should be located with respect to the highway pavement or shoulder in accordance with the criteria in Chapter 2A and Figures 2A-2 and 2A-3, and should be located with respect to the nearest track in accordance with Figure 8C-2.
09 The minimum lateral offset for the nearest edge of the Crossbuck sign should be 6 feet from the edge of the shoulder or 12 feet from the edge of the traveled way in rural areas (whichever is greater), and 2 feet from the face of the curb in urban areas.
MUTCD § 8B.03 (2009 ed.) (emphasis in original).[12] Chapter 2A includes the stan *334 dards, recommendations, and options for all roadside signs. Figures 2A-2 and 2A-3 pertain to height and lateral placement of signs. Roadside signs in rural areas should be twelve feet from the edge of the road if possible. MUTCD, Figure 2A-2. The “Guidance” refers to Figure 8C-2 regarding location of a crossbuck with respect to the track. Figure 8C-2 indicates that traffic control devices are to be twelve feet from the center of the track, not from the edge of the track as Travis claims. Travis cites Exhibit D-17 as evidence that the crossbuck was less than twelve feet from the rail. Exhibit D-17 is a sketch of the crossing area, with no indication of how far the crossbuck is from tracks. Travis’s claim that the sign was less than twelve feet from the tracks is not supported by the evidence; regardless, that is not the rule. The MUTCD suggests that signs be twelve feet from the center of the tracks, but this is not a requirement. Travis presented no evidence that the cross-buck sign was not in compliance with the MUTCD.
¶ 39. Travis also alleges that the cross-buck sign was bent and that the words “Railroad Crossing” were barely legible. Photographs of the sign, entered into evidence as Exhibits D-59 (taken by Travis’s investigator on June 2, 1997) and D-128 (taken by Illinois Central’s investigator on the day of the accident, May 16, 1997), do not support Travis’s claim. In the photographs, the sign is visible, and the words are legible. This Court has held that conflicting testimony about conditions must yield to physical evidence. Russell v. Miss. Cent. R.R. Co., 239 Miss. 741, 125 So.2d 283, 285 (1960) (quoting S.H. Kress & Co. v. Sharp, 156 Miss. 693, 126 So. 650, 651 (1930)). The photographs show that the crossbuck sign was in compliance with Mississippi Code Section 77-9-247 and the MUTCD.
¶ 40. Travis asserted that, because the sign was too close to the tracks and “failed to command attention,” Michael did not know where to stop, resulting in his being too close to the tracks. This claim is without merit. Despite the fact that Travis failed to prove that the sign was improperly positioned and/or that it was defective, Travis cannot blame placement of the sign for Michael’s failure to stop prior to reaching the tracks. There is no question that Michael was aware of the railroad crossing, as he crossed it multiple times per week, and he had a duty to stop before reaching the crossing to determine if a train was approaching.
¶ 41. The duties of automobile drivers at railroad crossings are a matter of statutory law. Ala. Great S. R.R. Co. v. Lee, 826 So.2d 1232, 1236 (Miss.2002).[13] Those duties are set forth primarily in *335 Mississippi Code Section 77-9-249, which provides, in part:
(1) Whenever any person driving a vehicle approaches a railroad grade crossing under any of the circumstances stated in this section, the driver of such vehicle shall stop within fifty (50) feet but not less than fifteen (15) feet from the nearest rail of such railroad, and shall not proceed until he can do so safely. The foregoing requirements shall apply when:
(c) A railroad train approaching within approximately nine hundred (900) feet of the highway crossing emits a signal in accordance with Section 77-9-225, and such railroad train, by reason of its speed or nearness to such crossing, is an immediate hazard; or
(d) An approaching railroad train is plainly visible and is in hazardous proximity of such crossing.
(4) At any railroad grade crossing provided with visible railroad crossbuck signs without automatic electric or mechanical signal devices, crossing gates[,] or a human flagman giving a signal of the approach or passage of a train, the driver of a vehicle shall, in obedience to such railroad crossbuck sign, yield the right-of-way and slow to a speed reasonable for the existing conditions, and shall stop if required for safety at a clearly marked stop line, or if no stop line, within fifty (50) feet, but not less than fifteen (15) feet, from the nearest rail of the railroad, and shall not proceed until he can do so safely.
Miss.Code Ann. § 77-9-249(1), (4) (Rev. 2009). In this ease, the train was within 900 feet, blowing its horn, and was clearly visible to one exercising due care. Therefore, Michael had a duty to stop no less than fifteen feet from the tracks. Even if Michael did not hear or see the train, there was no gate or mechanical device at this crossing, so he had a duty to obey the crossbuck sign and to slow or stop before crossing the tracks to determine if it was safe to proceed. Therefore, regardless of the location or condition of the crossbuck, Michael was required to “slow to a speed reasonable” or stop, if necessary, no less than fifteen feet from the tracks to determine if it was safe to cross.
¶ 42. Travis did not point to any evidence to support her claim that the sign was improperly positioned. There is no question that Michael was familiar with the crossing and that he knew he was approaching the tracks. Regardless of the location or condition of the crossbuck sign, Michael had a duty to stop fifteen feet before the tracks to determine if it was safe to proceed. Travis’s claim that the crossbuck sign failed to comply with Mississippi law and the MUTCD is without merit; and to the extent the jury considered this allegation in reaching its verdict, the verdict is not supported by the evidence presented.
F. Whether there was a basis to support Travis’s allegations regarding the “extra-hazardous” nature of the crossing.
¶ 48. Travis claimed that the Mileston crossing was “extra-hazardous” due to overgrown vegetation, which prevented drivers from seeing oncoming trains. Three witnesses were called to testify at trial about vegetation existing on the field side of the crossing. However, the witnesses’ testimony was blatantly contradicted by day-of-the-accident photographs, which show no overgrown vegetation that would have obstructed Michael’s view. As we did in the 2006 appeal, we ■will provide a brief description of the Mile-ston crossing to aid in the discussion:
*336 The railroad tracks run generally north and south. Highway 49 runs generally parallel with the tracks, and in the area of the Mileston crossing, Highway 49 is located a mere seventy-five feet west of the tracks. A relatively short distance north of the Mileston crossing, the tracks curve. A southbound train approaching Mileston crossing from the north would curve to the right. If a southbound train is approaching this curve as the driver of a westbound vehicle is approaching Mileston crossing from the east, that driver, if the driver is looking, should be able to notice the headlights of the train as it comes into the curve. On the date of the accident, Michael was driving his truck in a westerly direction as he approached Mileston crossing. At the same time, a tractor with an oversized farm implement was approaching Mileston crossing traveling in an easterly direction. Throughout the trial, the west side of Mileston crossing was referred to as the “highway side” and the east side of Mileston crossing was referred to as the “field side.” ... Once Michael reached the crossing, he had to back up his truck in order to allow the eastbound tractor to cross the tracks. Once the tractor approaching from the highway side had cleared the tracks on the field side (Michael’s side), Michael then slowly drove his truck up on the tracks where the southbound train collided with his truck....
Irby, 935 So.2d at 889.
¶ 44. At trial, Travis called three witnesses who were at or near the crossing when the train struck Michael’s car — Anne Marie Sago, Alvin Haymer, and Thelma Washington. All three testified that vegetation on the field side of the crossing made it difficult to see an approaching train. Their testimony was that the vegetation and the steep approach to the crossing required a motorist to pull almost onto the track to see if a train was approaching. However, Sago admitted that the vegetation did not cause a problem if the driver was paying attention and looked both ways before crossing. Haymer testified that drivers should stop before reaching the crossing to look for a train due to the speed with which the train reaches the crossing after coming out of the curve, the first time it is visible.
¶ 45. Photographs of the crossing from the day of the accident contradict the witnesses’ testimony about overgrown vegetation. The photographs show a wide-open view of the tracks, dead grass near the tracks, and little vegetation around the tracks near the crossing. Certainly, twelve years after the accident, the witnesses might not remember exactly what the crossing looked like on the day of the accident. Conflicting testimony about conditions “which is based merely on memory, estimate!,] or casual observation,” must yield to physical evidence, such as actual measurements or day-of-the-accident photographs. Russell, 125 So.2d at 285 (quoting S.H. Kress, 126 So. at 651).
¶ 46. Both parties submitted day-of-the-accident photographs into evidence. Photographs had been taken after the accident by the Holmes County deputy sheriff, a local attorney, and an Illinois Central investigator. Michael’s body can be seen in several of the photos taken by the sheriff. When shown those pictures, Sago admitted that the grass in the photos was brown and dead. Although she maintained that the grass was taller and green on the day of accident, she conceded it was unlikely that someone went out and killed the grass with Michael’s body lying there. Defense counsel asked Sago to look at two photos that showed Michael being assisted by paramedics near the track and one photo of *337 Michael’s truck after the accident.[14] The following exchange occurred:
Q. ... Would you agree with me that that grass that’s shown there is brown? Do you remember seeing that on the day of the accident?
A. Yes.
Q. ... And on the left side ... This area here, that grass is brown, isn’t it?
A. Yes. On this picture, yeah.
Q. Yeah. And that grass is dead, is it not?
A. Yes.
Q. ... if you were looking from this point ... somewhere back toward the crossing and you were looking back to your left, there’s nothing by way of vegetation or grass that would prevent you from seeing all the way at least to [this] point ... [indicating]. Am I not correct?
A. Yes. The way it look[s] there. But it was taller than that and it was green.
Q. When?
A. On the day that he had that accident.
Q. ... you just testified that that is Mr. Travis lying in the ditch there.
A. Right.
Q. That would have been the day of the accident, was it not?
A. Yes.
Q. You wouldn’t tell this jury that you believe somebody went out there and killed this grass after Mr. Travis’s accident and while he was still lying in the ditch, would you?
A. No. No. I wouldn’t.
Q. Now, if this picture was taken on the day of the accident and it shows that this grass is dead, you would agree that would have to have been the condition of the area where this truck was stopped at. Would you not agree with that?
A. Yes.
Haymer and Washington also were shown several day-of-the-accident photographs; they both admitted that, in the photographs, the grass near the tracks was dead. Again, conflicting testimony from witnesses about conditions must yield to physical evidence, such as day-of-the-accident photographs. Russell, 125 So.2d at 285 (quoting S.H. Kress, 126 So. at 651). From the evidence presented, we conclude that the photographs taken on the day of the accident accurately depict the crossing at the time of the accident and depict what a driver approaching the crossing would have seen.
¶ 47. This Court considered the same photographs and addressed this issue in the first appeal. We found that there was no question that a driver approaching from the field side of the crossing would have had an “unobstructed view” of the train. Irby, 935 So.2d at 889.
Certain “day-of-the-accident” color photographs introduced at the trial revealed that the driver of a westbound vehicle approaching Mileston crossing from the field side should have a clear, unobstructed view of a southbound train as far north of the crossing as the curve.... Once the tractor was on the field side of the tracks and passing Michael’s truck, the tractor would have been on the south side of Michael’s truck. The southbound train was ap *338 proaching Mileston crossing from the north side of Michael’s truck. If Michael is looking to his right, he should see, not the tractor, but instead the southbound train traveling fifty-two miles per hour.
Irby, 935 So.2d at 889. Although several witnesses testified about vegetation near the crossing, that testimony was unreliable due to inconsistency with the day-of-accident photographs. Photographs of the crossing on the day of the accident clearly show that the vegetation near the crossing was not overgrown such that it would have blocked Michael’s view. Travis’s claim that the crossing was extra-hazardous due to overgrown vegetation is without merit, and to the extent that the jury considered the allegations of overgrown vegetation in reaching its verdict, the verdict is not supported by the evidence.
G. Whether there was a basis to support Travis’s allegations regarding the overall condition of the crossing.
¶ 48. In addition to alleged overgrown vegetation, Travis claimed that Illinois Central had failed to maintain the overall condition of the crossing—complaining about the configuration of the crossing, that the road was gravel and had potholes, and that the grade of the crossing was too steep. Travis alleged that Illinois Central was negligent per se because it (1) failed “to make an easy and proper grade at the Mileston crossing” and (2) failed “to keep the crossing in good order” as required by Mississippi Code Section 77-9-251. There is no evidence to support those allegations.
¶49. This Court has said that “[t]he test of whether a railroad crossing is unusually dangerous” is the ability of a motorist to see an approaching train “from the direction in which it is coming.” Ill. Cent. R.R. Co. v. McDaniel, 246 Miss. 600, 151 So.2d 805, 811 (1963). Other factors that may result in a crossing being deemed “unusually dangerous” include “an unusually steep or dangerous grade in the highway,” a condition preventing drivers from seeing or hearing trains, and “unusual congestion or traffic.” New Orleans & N.E. R.R. Co. v. Phillips, 252 Miss. 438, 172 So.2d 414, 419-20 (1965). Mississippi Code Section 77-9-251 provides that, where a railroad crosses a highway “and it [is] necessary to raise or lower the highway, it shall be the duty of the railroad company to make proper and easy grades in the highway, so that the railroad may be conveniently crossed, and to keep such crossings in good order.” Miss.Code Ann. § 77-9-251 (Rev.2009).
¶ 50. Discussing a railroad’s duty under Mississippi Code Section 77-9-251, this Court has said:
This section clearly imposes a public duty on railroads to construct and maintain convenient crossings and to keep such crossings in good order. This statute does not, however, place a duty on the railroad to make grades or to keep crossings in such condition as [will] make railroad crossings safe and easy under any and all circumstances. Their duty is to make and keep in repair such necessary and easy grades as will permit safe and convenient passage over its roadbed by persons using reasonable care in the use of such crossings. Gulf & Ship Island R.R. v. Simmons, 150 Miss. 506, 117 So. 345[, 350-51] (1928) [(quoting Gulf & Chicago R.R. Co. v. Sneed, 84 Miss. 252, 36 So. 261, 262 (1904) ].
Miss. Export R.R. Co. v. Miller, 193 So.2d 134, 136 (Miss.1966). See also Gordon v. Ill. Cent. R.R. Co., 190 Miss. 789, 1 So.2d 772, 774-75 (1941) (“a railroad’s duty is ... to use ordinary care to keep [highway crossings] in a reasonably safe condition *339 for persons exercising ordinary care and prudence”) (internal citations omitted); Ala. & Vicksburg Ry. Co. v. Graham, 171 Miss. 695, 157 So. 241, 246 (1934). Thus, a railroad company must use reasonable care in maintaining crossings and must ensure that crossings are reasonably safe for persons exercising reasonable care, but it is not required to ensure that a crossing is free from all obstructions or to ensure that an accident will never occur at a crossing. Miller, 193 So.2d at 136; Buffington v. Gulf & Ship Island R.R., 186 Miss. 132, 188 So. 563, 563 (1939) (“railroad company is not required to maintain a crossing whereat [sic ] no injury is possible”). See also Shofner v. Ill. Cent. R.R. Co., 188 F.Supp. 422, 427 (N.D.Miss.1960), aff'd, 300 F.2d 188 (5th Cir.1962).
¶ 51. Railroad companies are not responsible for maintaining roads leading to crossings. See Bentz v. Louisville & Nashville R.R. Co., 183 Miss. 563, 184 So. 448, 449 (1938) (railroad company “is no insurer of the safety of streets at its crossings ... ”); Sardis & Delta R.R. Co. v. Gordan, 100 Miss. 786, 57 So. 219, 220 (1912) (condition of the road leading to the crossing was not relevant in suit against railroad involving condition of railroad crossing); Gulf & Chicago R.R. Co. v. Sneed, 84 Miss. 252, 36 So. 261, 262 (1904) (accident occurred “not on the crossing, nor by reason of the condition of the crossing, nor on any grade constructed by appellant, but after the railroad had been safely passed and the buggy was again traveling over the public highway,” which the board of supervisors was responsible for maintaining); Bowman v. CSX Tramp., Inc., 931 So.2d 644, 654 (Miss.Ct.App.2006) (hole in road leading to crossing was outside area of railroad’s responsibility; the Mississippi Department of Transportation was responsible “for inspecting the entire crossing and for maintaining the part of the road” where hole appeared).
¶ 52. Further, railroad companies have “no control over or right to determine and fix, or change, the grade of the highway of its right-of-way.” Gulf & Ship Island R.R. v. Simmons, 150 Miss. 506, 117 So. 345, 351 (1928). In Simmons, the Court found that the railroad “constructed grades within the limits of its right of way to conform to and connect with the grades of the highway as maintained by the county authorities.” Id. Therefore, the railroad company had no duty to change the grade on the crossing when it was made to be consistent with the highway. Id. At trial, the jury heard testimony from Illinois Central’s corporate representative, Ken Robinson, who testified that the grade at the crossing was not “severe,” it was “just an elevated crossing” like others in the Delta. Elevating railroad tracks is necessary in the flat Delta region due to the potential for flooding, which could result in trains being overturned and could cause serious problems. Consistent with Robinson’s testimony, photographs of the crossing from the day of the accident show only a slight incline in the road approaching the tracks, not an unusually steep grade that would be difficult to navigate. Therefore, not only was the slight grade necessary due to the surroundings, but it was not extraordinarily steep such that it would render the crossing “unusually dangerous.”
¶ 53. Illinois Central did not have any control over the grade in the crossing, nor any responsibility to change it. Likewise, Illinois Central was not responsible for paving the roads leading to the crossing. And, as discussed above, Travis’s claims regarding overgrown vegetation were not supported by the physical evidence. There is no evidence of a dangerous grade in the highway, any condition preventing the train from being seen or heard, or an unusual level of traffic at this crossing. *340 The record is clear that a driver in Michael’s position could have seen the approaching train if he had looked. According to the standards set out in McDaniel and Phillips, there is no evidence that the Mileston crossing was “unusually dangerous,” and Travis’s allegations regarding the overall condition of crossing are without merit. To the extent the jury considered Travis’s allegation that the crossing was unusually dangerous in reaching its verdict, the verdict is not supported by the evidence.
CONCLUSION
¶ 54. In Illinois Central Railroad Co. v. Smith, 243 Miss. 766, 140 So.2d 856 (1962), this Court found that the decedent was not looking or listening, which is why he did not see or hear the oncoming train, and that the decedent’s failure to look and listen for the train was the proximate cause of the collision. Id. at 859. We held:
We are confident that the decedent did not see or hear the approaching train when he drove upon the crossing; that if he had seen the train he would not have, of course, driven on the crossing ahead of the approaching train; and we think that the reason he did not see or hear the train in time to avoid the fatal accident was the fact that he was not looking or listening. We do not think that there is any substantial evidence of negligence on the part of the defendant railroad company in this case but that the decedent’s failure to look or listen for the train was the sole proximate cause of the collision of the train with his automobile, and, therefore, the sole proximate cause of his death.
Id. We are confident that the same is true here. The evidence is clear that Michael could have and would have seen the train if he had looked. The evidence presented, considered in the light most favorable to Travis, does not support the jury’s verdict that negligence on the part of Illinois Central caused or contributed to the accident. We recognize that all railroad crossings are inherently dangerous. However, a railroad will not' be held liable where it committed no negligence, and where the evidence indicates that the driver simply failed to look and listen for the train.
Railroad crossings are dangerous places, and they are no less so that we encounter the danger with less frequency than in other days. Wilner v. Mississippi Export Railroad Co., 546 So.2d at 681. Accepting these realities, our statute law mandates a motorist “look and listen as he approaches a crossing.” Mitcham v. Illinois Central Gulf Railroad Co., 515 So.2d [852,] 855 [ (Miss.1987) ]; Slay v. Illinois Central Gulf Railroad Co., 511 So.2d [875,] 880 [ (Miss.1987) ]; Dale v. Bridges, 507 So.2d 375, 377 (Miss.1987). When trains approach sounding their signals, roadway travelers must give heed. Miss.Code Ann. § 77-9-249 (1972).
Sawyer v. Ill. Cent. Gulf R.R. Co., 606 So.2d 1069, 1075 (Miss.1992).
¶ 55. Although this case is tragic and the outcome may seem harsh, our holding today is not unprecedented. On many occasions, this Court has held that a railroad company is not liable where there is no evidence of negligence by the railroad, especially where it is evident that the injured or deceased would have seen and heard the train if he or she had looked and listened. See Strantz v. Pinion, 652 So.2d 738 (Miss.1995); Ill. Cent. Gulf R.R. Co. v. Yates, 334 So.2d 364 (Miss.1976); Gulf, Mobile & Ohio R.R. Co. v. Grubbs, 260 So.2d 837 (Miss.1972); Ill. Cent. R.R. Co. v. Smith, 243 Miss. 766, 140 So.2d 856 (1962); Russell v. Miss. Cent. R.R. Co., 239 Miss. 741, 125 So.2d 283 (1960); Ill. *341 Cent. R.R. Co. v. Roberson, 186 Miss. 507, 191 So. 494 (1939); New Orleans & N.E. R.R. Co. v. Holsomback, 168 Miss. 493, 151 So. 720 (1934); Mobile & O.R. Co. v. Bryant, 159 Miss. 528, 132 So. 539 (1931); Hancock v. Ill. Cent. R.R. Co., 158 Miss. 668, 131 So. 83 (1930).
¶ 56. The evidence presented in this case does not support the jury’s verdict. The facts point overwhelmingly in favor of Illinois Central, and the evidence presented at trial does not indicate any negligence by Illinois Central. Therefore, we hold that the trial court erred by denying Illinois Central’s motion for judgment notwithstanding the verdict, and we reverse the trial court’s judgment and render judgment here that Travis take nothing and that this action be dismissed with prejudice. Because this issue is dispositive, we decline to address the other issues raised by Illinois Central.
¶ 57. REVERSED AND RENDERED.
WALLER, C.J., DICKINSON, P.J., RANDOLPH, LAMAR AND PIERCE, JJ., CONCUR. KITCHENS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY CHANDLER AND KING, JJ.

. Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

. Evidence presented in the first trial that was excluded at the second trial included: evidence related to prior accidents and near-accidents; Dr. Kenneth Heathington’s testimony about warning devices used at other crossings and by other companies; evidence related to allegations of inadequate signals; and evidence pertaining to an alleged duty to install certain lighting and gates at the crossing.

. The 2009 version of the Mississippi Code, which is the latest version, is cited throughout this opinion. The text of the statutes cited herein is the same as in the 1996 Code, which was applicable when this accident occurred.

. Operating Rule 14(p) requires the horn to be sounded in a succession of short sounds if a person or livestock is on the tracks. Rule 14(p) is not applicable, because Michael was not on the tracks, nor did it appear that he would continue onto the tracks.

. We note that Illinois Central raised certain issues with respect to the validity and admissibility of Dr. Lipscomb’s testimony, although we decline to rule on that here.

. The Court notes that Illinois Central did not propose a jury instruction to this effect.

. See also Davis v. CSX Transp., Inc., 178 F.3d 1290, *5 (5th Cir.1999) (engineer "ordinarily has the right to presume that the person is in possession of his faculties and that he will note the alarm being given” and "an operator need not slow a train until circumstances show that the person will probably not seek safety”); Woods v. Amtrdk, 982 F.Supp. 409, 412-13 (N.D.Miss.1997) (engineer entitled to assume that driver “would stop for an approaching train, and thus had no duty to stop or slow the train for the approaching vehicle”); Wilner v. Miss. Export R.R. Co., 546 So.2d 678, 681-82 (Miss.1989) (“railroad was entitled to assume that approaching motor vehicle drivers wouldf] upon seeing the signsf,] slow sufficiently to see whether or not a train was on or near the crossing”); Gallent v. Louisville & Nashville R.R. Co., 420 So.2d 1068, 1071 (Miss.1982) (trial court did not err in granting jury instruction that stated “the operators of the train engine had a right to indulge in the presumption that the plaintiff would not drive his automobile onto the tracks in front of the train without first stopping as required by law”); Gulf, Mobile & Ohio R.R. Co. v. Grubbs, 260 So.2d 837, 839 (Miss.1972) (trainmen had a right to assume vehicle would stop as required by law); Mobile & O.R. Co. v. Johnson, 165 Miss. 397, 141 So. 581, 581 (1932) (no duty to anticipate that drivers will “pass by the statutory stop sign and go upon the right of way and upon the track without stopping, looking, and listening”); Mobile & O.R. Co. v. Bryant, 159 Miss. 528, 132 So. 539, 540 (1931) (train crew should not have anticipated that automobile traveling parallel to track would turn onto the track “without stopping or slackening speed”).

. Stated differently, based on the well-established premise that one will travel eighty-eight feet per second traveling at the rate of sixty miles per hour (and based on the parties' stipulation that at fifty-two miles per hour the train was traveling approximately 76.25 feet per second), it would have taken the train engineered by Irby, traveling at the rate of fifty-two miles per hour, 12.59 seconds to travel the 960 feet from the whistle sign to the crossing if the emergency brakes were not applied. But with the emergency brakes applied, it would take only one half second longer to reach the crossing. Thus, with the emergency brakes applied, it would have taken 13.09 seconds for the train to travel from the whistle sign to the crossing.

. In a separate argument, Illinois Central alleges that the trial court erred in modifying proposed Jury Instruction D-7, which Illinois Central claims would have instructed the jury that the speed of the train was not a contributing factor to the accident. The jury was instructed properly that speed was not a factor. The omitted language was relevant, however, in that it would have instructed the jury that the train did not have a duty to brake. The omitted language stated, in part: “You are instructed that you may not return a ver-diet against Illinois Central or the train crew based on any claim that the train should have slowed or applied its brakes at an earlier point in time....”

. We recognize that claims of this nature often are preempted by federal law where federal funding has been used to install the warnings or signs at a crossing. In this case, there is no evidence that federal funds were spent at the Mileston crossing.

. This Court has held that "[i]t is the duty of an appellant to provide authority in support of an assignment of error." Entergy Miss., Inc. v. Bolden, 854 So.2d 1051, 1057 (Miss.2003) (quoting Jones v. Howell, 827 So.2d 691, 702 (Miss.2002)). An assertion of error unsupported by cited authority "is deemed abandoned" and "need not be considered by the Court.” Entergy, 854 So.2d at 1057 (citing Jones, 827 So.2d at 702, and Dawdle Butane Gas Co. v. Moore, 831 So.2d 1124, 1136 (Miss.2002)). Because Travis did not cite any authority in support of the claim that the crossbuck sign must be twelve feet from the nearest rail, this Court is not required to examine that claim. However, because we have decided to reverse and render, we will address this claim briefly to bring finality to all issues.

. The layout of the 2009 version of the MUTCD is different, but the language is virtually the same as the 1988 version, which was applicable at the time of the accident. The relevant language in the 1988 version read:
... As a minimum, one crossbuck sign shall be used on each roadway approach to every grade crossing, alone or in combination with other traffic control devices.... Crossbuck signs should be located with respect to the roadway pavement or shoulder in accordance with the criteria in sections *334 2A-21 through 2A-27 and figures 2-1 and 2-2 ... and should be located with respect to the nearest track in accordance with signal locations in figure 8-7, (page 8C-6). The normal lateral clearances (sec.2A-24), 6 feet from the edge of the highway shoulder or 12 feet from the edge of the traveled way in rural areas and 2 feet from the face of the curb in urban areas will usually be attainable.
MUTCD § 8B-2 (1988 ed.). Sections 2A-21 through 2A-27 and figures 2-1 and 2-2 pertain to the lateral placement of signs. As a general rule, roadside signs should be on the right-hand side of the road, and in rural areas, signs should be placed "12 feet from the edge of the traveled way” when possible. Id. at §§ 2A-21, 2A-24, Figure 2-1. According to Figure 8-7, railroad crossing signs should be twelve feet from the center of the track.

. At common law, drivers had a duty "to do that which was reasonably necessary to ascertain whether a train was approaching before driving onto the track.” Ala. Great S. R.R. Co. v. Lee, 826 So.2d 1232, 1236 (Miss.2002) (citing Columbus & Greenville R.R. Co. v. Lee, 149 Miss. 543, 115 So. 782, 785 (1928)).

. The photographs shown to Sago were Plaintiffs’ Exhibits P-262, P-263, and P-264. Those photographs of the accident scene were taken by the Holmes County deputy sheriff immediately after the accident.